ANAPOL WEISS
By: David S. Senoff, Esquire
By: Hillary B. Weinstein, Esquire
1040 N. Kings Highway
Cherry Hill, NJ 08034
(856) 427-9229
dsenoff@anapolweiss.com
hweinstein@anapolweiss.com

MARCUS & AUERBACH, LLC
By: Jerome M. Marcus, Esquire*
By: Jonathan Auerbach, Esquire*
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
auerbach@marcusauerbach.com
jmarcus@marcusauerbach.com

*Pro Hac Admission to be sought

*Attorneys for Plaintiff and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE ESTATE OF LESTER COTTON, on behalf of himself and all others similarly situated, | : : : : | CIVIL ACTION CLASS ACTION |
| Plaintiff, | : : : | COMPLAINT FOR JURY TRIAL |
| v. | : : | No. |
| SENIOR PLANNING SERVICES, LLC; LTC CONSULTING SERVICES, LLC; and PRICE & PRICE LLC | : : : : | |
| Defendants. | : | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff, the Estate of Lester Cotton ("Plaintiff")[1] residing at 423 Melrose Avenue,

Maple Shade, NJ 08052, individually and upon behalf of all others similarly situated, by and

through its attorneys Anapol Weiss with offices located at 130 North 18th Street, Philadelphia,

Pennsylvania 19103, hereby brings this action seeking relief from Senior Planning Services LLC

---

[1] Mr. Cotton, who resided at 123 Adams Street, Riverside, New Jersey 08075, passed away on August 17, 2018.  He is represented in this class action by his daughter Jennifer Cotton, who is his power of attorney and executrix of his estate, and who resides at 423 Melrose Avenue, Maple Shade, NJ 08052.

("SPS"), which has its principal place of business located at 100 Boulevard of the Americas, Lakewood, New Jersey 08701; LTC Consulting Services LLC ("LTC"), which also has its principal place of business located at 100 Boulevard of the Americas, Lakewood, New Jersey 08701; and Price & Price, LLC, which has its principal place of business at 35 Kings Highway East #110, Haddonfield, New Jersey 08033 (together, "Defendants"), and alleges as follows based upon personal knowledge as to Mr. Cotton, his estate, his daughter (the executrix of the Estate), and together with their own acts and experiences, and as to all other matters, based upon information and belief, including investigation conducted by Plaintiff's attorneys, the undersigned.

## I.    <u>INTRODUCTION</u>

1.     Plaintiff, on behalf of itself individually and all others similarly situated (the "Class"), alleges that Senior Planning Services and LTC Consulting Services were partners, along with the law firm of Price & Price LLC, in a scheme to defraud senior citizens and other persons with disabilities, under the guise of assisting Plaintiff and the other Class Members to gain eligibility for Medicaid and other public long-term care benefits.

2.     Since its inception in 2009, SPS has purported to assist families and individuals with securing Medicaid benefits, specifically by providing what has been found to be legal advice related to that process.  However, in May 2016, the New Jersey Committee on the Unauthorized Practice of Law,[2] issued a decision that addressed the activities of SPS in particular and specifically deemed that by performing the services that SPS was performing, SPS (though unnamed in the decision) was engaging in the unauthorized practice of law.  (This decision will be referred to hereafter as the "May 2016 Decision").  *See* Committee on the

---

[2] This Committee is appointed by the New Jersey Supreme Court and is empowered by that Court to render advisory opinions. *See generally,* N.J. Ct. R. 1:22. Committee on the Unauthorized Practice of Law.

Unauthorized Practice of Law, Opinion 53, "Non-Lawyer Medicaid Advisors (Including 'Application Assistors') and the Unauthorized Practice of Law (May 16, 2016), a true and correct copy of which is attached hereto as Exhibit "A" and made a part hereof.  The May 2016 Decision adopted the reasoning of, and followed, decisions by similar advisory opinions from Ohio, Florida and Tennessee[3], which also declared that the same practices engaged in by SPS constituted the unauthorized practice of law.

3.    The May 2016 Decision held that while the federal Medicaid program requires states to permit non-lawyers to assist applicants and beneficiaries with Medicaid applications and represent persons at hearings, Medicaid regulations specifically prohibited individuals from **providing advice on issues such as strategies for Medicaid eligibility, spending down or sale/transfer of assets, tax implications, guardianships, or the creation of trusts or service contracts: all things that SPS advertised, and promised, to the public that it could and would do**.

4.    The May 2016 Decision applied federal regulations such as 42 C.F.R. § 435.908 (effective January 1, 2014), which also explicitly prohibit individuals providing such legal advice.  These regulations allow such "assistors" only to provide information on insurance availability, to help individuals fill in the blanks on Medicaid application forms and gather the necessary documentation, and to submit and follow up on an application or renewal.

5.    Following the May 2016 Decision, Defendant SPS slightly revised its marketing materials on its New Jersey webpage (and only on its New Jersey webpage) to remove certain

---

[3] *See* Board on the Unauthorized Practice of Law of the Supreme Court of Ohio Advisory Opinion UPL 11-01 (October 7, 2011), available at
https://www.supremecourt.ohio.gov/Boards/UPL/advisory_opinions/UPLAdvOp_11_01.pdf; Florida Bar Standing Committee on the Unlicensed Practice of Law FAO #2011-4 "Medicaid Planning Activities by Nonlawyers," (October 14, 2014), available at https://www.courtlistener.com/opinion/2770255/the-florida-bar-re-advisory-opinion-medicaid-plann/; State of Tennessee Office of the Attorney General Opinion No. 07-166, "Practice of Law; Medicaid Eligibility" (December 18, 2007), available at
https://www.tn.gov/content/dam/tn/attorneygeneral/documents/ops/2007/op07-166.pdf.

"legal" language, such as: "[SPS will help] Guide families through the spend-down process." It also entered into a relationship with the New Jersey-based law firm of Price & Price, who became the contractual provider of SPS's "legal services," as noted on SPS's Fee Agreement. *See* SPS post-2016 Fee Agreement packet (also attaching Price & Price Fee Agreement), a true and correct copy of which is attached hereto as Exhibit "B."

6.      However, this relationship provides little more than a mere cover for SPS's actions. In return for a miniscule portion of the $6500 fee (just over 5%), Price & Price placed its legal imprimatur on SPS's provision of exactly the same advice SPS was providing before the issuance of the May 2016 Decision. *See* SPS pre-2016 Fee Agreement, a true and correct copy of which is attached hereto as Exhibit "C."

7.      Price & Price allows its name to be used in this way even though no one from the law firm of Price & Price ever meets with the clients, or makes themselves available to answer any of their questions. All Price & Price does is send the client a completely generic document, which purports to be a Medicaid "spend-down analysis," while it contains little information specific to the client and therefore no meaningful legal advice at all. In reality, SPS simply uses Price & Price (and perhaps other firms) as a mere screen for SPS's provision of its own illicit legal advice.

8.      Even the "revision" of SPS's contract and marketing documents was only a thin veneer. Even after that "revision," and up to the present day, SPS continues to state in its marketing materials that it itself would "assist families in utilizing excludable resources,"[4] "assist clients in the process of liquidating life insurance policies, annuities, and stocks etc."[5] and

---

[4] *See* attached current New Jersey, New York, Pennsylvania, and Connecticut web pages from its website, true and correct copies of which are attached hereto as Exhibits "D," "E," "F," and "G," and available online under the "Services" tab of its main website: https://www.senior-planning.com.
[5] *Id.*

"curtail spend-down mishaps."[6]  In fact, SPS has not actually changed any of its behavior and continues to advertise and provide legal advice regarding strategies to facilitate, or "optimize" Medicaid eligibility to its clients, in <u>all</u> states in which it operates (New Jersey, New York, Pennsylvania, Connecticut, Rhode Island, and Massachusetts.  As shown in detail below in Paragraphs 57 through 78, SPS continues to engage in exactly the same practices it was engaged in before issuance of the May 2016 Decision and which the Decision held SPS could not engage in.

9.    SPS's "revision" of its contract and marketing materials, and its creation of the sham relationship between it and the law firm of Price & Price, make clear that SPS is intentionally defrauding each of its customers, selling them – and charging them thousands of dollars for – the purported provision of services which SPS knows it is not authorized to perform.

10.    In addition, as alleged in greater detail below, SPS is not only <u>not</u> authorized to perform these services: it also suffers from clear, gross and undisclosed invasions of privacy and conflicts of interest when it provides these services.  Plaintiff and the Class allege that LTC, SPS's "sister" company which provides billing and administration services for its long-term care facility clients, and thus maintains the patients' financial and medical records who reside at those facilities, has shared, and continues to share, those individuals' private financial and medical information with SPS.

11.    Upon information and belief, SPS took this information and then contacted and marketed its asset-planning services to the individuals either living at, or hoping to be admitted to, the long-term care facilities.  Through online and mailed literature, e-mails, personal

---

[6] *See* photograph of the SPS booth at the Health Care Association of New Jersey conference in Atlantic City (October 2018), a true and correct copy of which is attached hereto as Exhibit "H."

telephone calls, and in-person visits by SPS agents, SPS enticed elderly clients to sign up for Medicaid planning/application services.

12.     As a result of SPS's intimate relationship with LTC (who undeniably owes its duty to the long-term care facilities), SPS suffers from a clear conflict of interest because the advice that should be imparted to an actual or prospective long-term care patient, and Medicaid beneficiary, may not be in the best interest of the facility in which the patient resides or wishes to reside.  Divergence of interest between the patient and the facility may relate, for example, to the manner in which, or the speed at which, assets are spent down to enable the patient to qualify for Medicaid.

13.     By purporting to provide advice on this topic without disclosing that SPS's sister company (and apparent business partner) has ongoing and very lucrative relationships with these facilities, SPS is guilty of maintaining, and concealing, a grave conflict of interest (which, however, is fully known to, and indeed advertised to, the facilities themselves, as alleged more fully below at ¶¶ 83-91).  SPS's advertising fraudulently promises objective advice in the best interest of the "client" when in fact, because of these serious and undisclosed conflicts of interest, this representation is false and known to be false when made.

14.     Plaintiff and the Class were harmed because SPS advertised, and continues to advertise, that it is authorized to provide, and would provide, these expensive legal services, when in fact it was not so authorized under either federal and state law, and because SPS provided and provides these services while under a grave and undisclosed conflict of interest. As a result, each member of the class paid thousands of dollars to a non-lawyer as compensation for the non-lawyer to provide what are clearly legal services.  The contract between the parties is also therefore void.

15.     Plaintiff seeks all available relief from Defendants' extremely harmful, and ongoing, course of conduct pursuant to the New Jersey Consumer Fraud Act ("CFA"),[7] which imposes particularly stringent penalties against those who have caused pecuniary injury to someone who is a senior citizen,[8] and the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA")[9], the federal Racketeer Influenced and Corrupt Organizations Law ("RICO")[10], and other applicable common law.

## II.    JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to the federal questions raised in Count III, *infra. See, e.g.,* 18 U.S.C. § 1961, *et. seq.*  In addition, this Court has jurisdiction over the remaining counts pursuant to its supplemental jurisdiction, 28 USC § 1367(a), as the claims in those counts are so related to the claim in Count III, that they form part of the same case or controversy.

17.     All Defendants have their principal places of business located in New Jersey.  In addition, Defendants regularly and systematically conduct business within the State of New Jersey (as well as within the Commonwealth of Pennsylvania, and the States of New York, Connecticut, Rhode Island, and Massachusetts).  Finally, Defendants are organized and exist under the laws of the State of New Jersey.  Personal jurisdiction is, therefore, properly exercised over the Defendants.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a substantial part, if not all, of the events and/or omissions giving rise to the Plaintiff's claims emanated from activities within this jurisdiction, wherein Defendants also conduct substantial business.

---

[7] N.J.S.A. §§ 56:8-1, *et seq.*
[8] N.J.S.A. § 56:8-14:3.2a(2) (imposing penalty of not more than $30,000 if the violation was part of a scheme, plan, or course of conduct directed at senior citizens in connection with sales or advertisements).
[9] N.J.S.A. § 56:12, *et seq.*
[10] 18 U.S.C. § 1961, *et seq.*

### III.    THE PARTIES

19.    Lester Cotton, the decedent Plaintiff, was an adult citizen of New Jersey, who resided at 123 Adams Street, Riverside, New Jersey 08075.

20.    Mr. Cotton entered Cinnaminson Center, a Genesis HealthCare facility ("Genesis") located at 1700 Wynwood Drive, Cinnaminson, New Jersey, in early April 2018, as a result of a fall he endured at his house.  On April 2, 2018, Mr. Cotton assigned his power of attorney to his daughter, Ms. Jennifer Cotton.  *See* Cotton Power of Attorney, a true and correct copy of which is attached hereto as Exhibit "HH."  On August 17, 2018, Mr. Cotton passed away after enduring another fall at the Cinnaminson Center.  At that point, Ms. Cotton also became the executor of Mr. Cotton's estate.

21.    Defendant Senior Planning Services, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business located at 100 Boulevard of the Americas, Lakewood, NJ 08701.  Senior Planning Services is also registered to do business in New York and Connecticut.

22.    Defendant LTC Consulting Services, LLC is a limited liability corporation organized and existing under the laws of the State of New Jersey, also with its principal place of business located at 100 Boulevard of the Americas, Lakewood, NJ 08701.  LTC is also registered to do business in New York and Massachusetts.

23.    Defendant Price & Price LLC is a limited liability corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at 35 Kings Highway E, #110, Haddonfield, NJ 08033.

24.    Upon information and belief, Defendants SPS and LTC provide their services throughout the state of New Jersey, as well as in Connecticut, New York, Pennsylvania, Rhode Island, and Massachusetts.

25.    Upon information and belief, Defendant Price and Price, LLC provides its services throughout the state of New Jersey.

26.    Upon information and belief, including investigation and inquiry conducted by and through their attorneys, Plaintiff avers that Defendants were acting individually, jointly, and/or by and through their agents, servants, franchisees, workmen, employees and/or other representatives.

## IV.    FACTUAL BACKGROUND

### A.    Background of Medicaid and Long-Term Care

27.    Medicaid is a jointly-run federal and state government program established by Title XIX of the Social Security Act.[11]  If a beneficiary is eligible, Medicaid will pay for all or some of hospital services, doctor visits, prescriptions, nursing home care, and other services for, among others, those 60 years of age or older.

28.    The program is implemented through the federal Department of Human Services, Division of Medical Assistance & Health Services.  The relevant state agency is then required to provide assistance to persons who may be eligible for services.  42 C.F.R. §§ 435.904(e) and 435.908(a).

29.    New Jersey participates in the Medicaid program through the enactment of the New Jersey Medical Assistance and Health Services Act. NJSA 30:4D-1, *et seq*.  The county boards of social services assist in the administration of the New Jersey Medicaid program by

---

[11] 42 USCA § 1396 *et seq*.; *See generally,* Medicaid.gov, at https://www.medicaid.gov/medicaid/index.html

processing applications for Medicaid benefits and determining whether an applicant meets the financial eligibility standards.  N.J.A.C. 10:71-3.15(a).

30.     Generally, in order to qualify for Medicaid an applicant must not only be financially eligible but must also meet the medical necessity requirements.  N.J.A.C. 10:71-4.1; N.J.A.C. 10:71-3.10; N.J.A.C. 10:71-3.15.

31.     Although each state's rules differ slightly, generally, to receive long-term care services under Medicaid, a medical specialist must document that the individual needs those services through what is called "functional eligibility."  In other words, that individual must be unable to perform at least one specified daily living activity on their own: such as, bathing, dressing, using the toilet, or transferring to or from a bed or chair.

32.     To receive Medicaid, the individual must also meet financial eligibility factors determined by their particular state.  For instance, to qualify for institutional care in New Jersey, an individual may not have assets exceeding $2,000.00 in total.[12]  Thus, to qualify for Medicaid in New Jersey, an individual would need to spend down (or otherwise have properly invested or disposed of) nearly all of their assets.

33.     Additionally, Medicaid imposes a look-back period of five (5) years.  In New Jersey (and in most other states) if it is determined that an individual has given away or transferred their assets within the five years of the date they are applying for Medicaid benefits, that individual will actually become ineligible for Medicaid benefits for a period of time.

---

[12]  N.J.A.C. 10:71-4.5(c); N.J.A.C. 10:71-4.10 (b)(9); *See generally,* New Jersey Medicaid Program Eligibility, at https://www.state.nj.us/humanservices/dmahs/clients/medicaid/medicaid_program_eligibility.pdf

Currently in New Jersey, for every $343.85 transferred by the applicant, a penalty of (1) one day will be imposed and Medicaid benefits will not be paid out during this period.[13]

34.    There are, of course, exceptions to these rules, which again vary between states. For instance, in New Jersey, a home which serves as a principal residence of a spouse, or life insurance not exceeding $1,500.00 in face value, may be considered an excludable resource.[14] Also, an individual's spouse is allowed to keep up to approximately $126,420.00 of the couple's joint and individual assets, if that spouse is not also applying for Medicaid and will continue to live independently.[15]

35.    These rules are complex and vary from state to state, and thus are confusing, particularly to the elderly and infirmed—the very population that Medicaid is meant to assist.

36.    As Baby Boomers (those born between 1946 and 1964) officially entered senior citizen status in 2011, 10,000 Americans each day have reached retirement age, and will continue to do so at the same rate for the next ten years.[16]  Those individuals age 85 and over, who have the highest disability rate of any age group, are expected to grow from 4 million persons in 2000 to 21 million persons by 2050.[17]  It is therefore no surprise that in the past ten years, senior planning or placement companies have quickly sprung up, ready to take advantage of this fast-growing, and oftentimes vulnerable, population.

---

[13] N.J.A.C. 10:71-4.10; See New Jersey Medicaid Communication  NO. 18-06; *See generally,* New Jersey Medicaid Program Eligibility, at
https://www.state.nj.us/humanservices/dmahs/clients/medicaid/medicaid_program_eligibility.pdf
[14] N.J.A.C. 10:71-4.10;  *See generally,* New Jersey Medicaid Program Eligibility, at
https://www.state.nj.us/humanservices/dmahs/clients/medicaid/medicaid_program_eligibility.pdf
[15] 42 U.S.C. § 1396r-5(g); N.J.A.C. 10:71-4.8;
https://www.state.nj.us/humanservices/dmahs/info/resources/medicaid/2018/18-
02_Income_and_Resource_Standards_for_Medicaid_Only.pdf (referencing the "community spouse share").
[16] Russell Heimlich, "Baby Boomers Retire," Pew Research Center, Factank, http://www.pewresearch.org/fact-
tank/2010/12/29/baby-boomers-retire/ (Dec. 19, 2010).
[17] Urban Institute, "Meeting the Long-Term Care Needs of the Baby Boomers,"
https://www.urban.org/sites/default/files/publication/43026/311451-Meeting-the-Long-Term-Care-Needs-of-the-
Baby-Boomers.PDF, at 1 (May 2007).

37.    Federal regulations do require that states "must allow individual(s) of the applicant or beneficiary's choice to assist in the application process or during a renewal of eligibility." 42 C.F.R. § 435.908(b).  However, those regulations still do not permit individuals or companies to impart legal advice.  *See* 42 C.F.R. § 435.908(c)(2).

38.    Many of these companies, such as SPS or LTC, which do not hold any state or federally-sanctioned insurance or financial services or planning licenses and charge exorbitant fees, masquerade as financial or placement services working on the senior citizen's behalf, while they are actually working on behalf of, and in the best interest of their **true clients, the long-term care facilities**.[18]

39.    Thus, SPS's advertisements, which state that it will provide advice on spending down resources, tax implications, guardianships, the sale or transfer of assets, and/or the creation of trusts or service contracts, are misleading because SPS is not legally authorized to provide such advice.  And, such advice is never provided in and for the best interests of their senior citizen clients, often carrying extreme financial and legal ramifications for – and causing grave financial injury to – these individuals and their families.

## B.    Formation and Background of SPS and LTC

40.    Senior Planning Services LLC was incorporated in New Jersey in March 2009, a mere two years before the Baby Boomers were to enter retirement age.  It was incorporated by a Mark Josefovic, and lists an additional member/manager as Michael Bauman.[19]

---

[18] *See* Michael J. Berens, "Senior-care placement companies scramble to cash in," Seattle Times, Dec. 11, 2010 (examining the state of the aged in Washington state's adult family homes, stating: "[n]ationally, elder placement is a rapidly expanding, multimillion-dollar industry that serves the nation's growing aged population… Many have stellar records and serve as an important bridge between seniors who need care and the facilities with open beds. But the lure of making fast money has also attracted dozens of profiteers to this little-examined industry. They face no licensing, education or training requirements, and can quickly set up shop.").
[19] *See* Senior Planning Services LLC Certificate of Formation, a true and correct copy of which is attached hereto as Exhibit "I," and made a part hereof.

41.    LTC Consulting Services LLC was incorporated in New Jersey in February 14, 2006, by a Miriam Biegeleisen, and lists these same two members, Mark Josefovic and Michael Bauman.[20]

42.    Throughout the relevant time period, SPS and LTC have represented themselves as "affiliates" of one another, both in sales brochures,[21] and on their websites.[22]

43.    The two entities also share the same executives.  SPS states on its website that it was founded by Michael Bauman, Mark Josefovic, and Ben Mandelbaum.[23]  LTC's website also lists amongst its executives CEO Michael Bauman, CFO Mark Josefovic, and COO Ben Mandelbaum.[24]

44.    **Defendant LTC** describes itself on its website as providing skilled long-term care facilities "with a comprehensive suite of critical finance, billing, and business office management services."  One of SPS's brochures states that LTC "oversees the business office operations for more than fifty facilities totaling more than $1,000,000,000 in annual sales."  *See* Exhibit K.

45.    **Defendant SPS** markets itself on its website and in some materials as experts in Medicaid planning for families and potential Medicaid applicants.  *See generally,* https://www.senior-planning.com, SPS Medicaid Guidance flyer, a true and correct copy of which is attached hereto as Exhibit "M," and SPS Medicaid Process Brochure, a true and correct copy of which is attached hereto as Exhibit "N."  Yet, as described by SPS in one of its recent

---

[20] *See* LTC Consulting Services, LLC Certificate of Formation, a true and correct copy of which is attached hereto as Exhibit "J," and made a part hereof.

[21] *See* Senior Planning Services Sales Brochure, a true and correct copy of which is attached hereto as Exhibit "K," and made a part hereof, at "Overview," p. 3; *see also* SPS 2018 brochure, a true and correct copy of which is attached hereto as Exhibit "L" and made a part hereof.

[22] The SPS and LTC websites and recent print brochures also list other affiliates as Streamline Verify (software programs), LTC Contracting (providing managed care contracting and licensure and credentialing), Streamline HR (providing HR management services for nursing facilities), SPS Pooled Trust (serving the disabled population) and SPS Community Solutions (providing Medicaid and financial services for long term home care programs).  *See* https://www.ltccs.com/affiliates/.

[23] https://www.senior-planning.com/company-profile/

[24] https://www.ltccs.com/why-ltcc/our-team/

brochures, **"[SPS's] unique relationship with LTC,** along with our distinct knowledge and expertise, enables us to understand and <u>meet facilities'</u> true needs, delivering unmatched success. Today, Senior Planning Services is utilized by a network of more than 1000 Healthcare facilities." *See* Exhibit L (emphasis added).

46.    While the marketing materials addressed to facilities emphasize the shared ownership of SPS and LTC (*see* Exhibits K and L), no marketing material directed to individuals or their families references the relationship between SPS and LTC (*see* Exhibits M and N).

### C.    SPS's Misleading Contract and Marketing Practices

### 1. Prior to 2016, SPS's marketing advertised legal advice

47.    Prior to 2016, SPS marketed itself as being able to assist with what has been definitively held to constitute "legal advice."  It represented on its website and in its print ads as being able to guide families or assist with "spend-down procedure" so as to aid in obtaining Medicaid approval.  *See* SPS NJ, PA, CT and NY pre-2016 websites, true and correct copies of which are attached hereto as Exhibit "O."  It also advertised itself in its Facebook ads as "Industry Leaders in Optimizing Medicaid Eligibility for Seniors."  *See* Feb. 14, 2015 Facebook ad, a true and correct copy of which is attached hereto as Exhibit "P."  In another July 16, 2014 Facebook post, SPS discusses and analyzes a hypothetical community spouse problem, advising the wife how to proceed in removing the husband's name from the deed to make him eligible for Medicaid.  *See* July 16, 2014 post, a true and correct copy of which is attached hereto as Exhibit "Q."

48.    In a December 4, 2014 interview with Neil Stern, Director of Marketing, Senior Planning Services, "NJ Medicaid and Qualified Income Trust, found at

https://www.youtube.com/watch?v=cnNzsMARETo, SPS repeatedly emphasized that applying

for Medicaid is a complex matter, but that they could perform the legal services necessary to assist in simplifying the process: *Id.* at 1:18 (**So, let's walk you through the qualified income trust process.  Firstly, the trust can be created by the resident who's applying for Medicaid, by the power of attorney, by no means does it have to be set up by a lawyer, it can be set up by the resident themselves…**); at 2:25 ("Now it's very important to note that the trust needs to be funded on the month of eligibility, so if I need Medicaid in January, I need to have that trust set up in January and funded in the month of January.  **I mean, we can set up that trust prior, as long as you fund it during the month you need benefits.**"); at 5:26 (**"It's critical that it's done correctly, there's too much at stake and the risk of failure is real… Senior Planning Services, we optimize Medicaid eligibility.  When we get involved with a family and we help them navigate the challenges of Medicaid, the risk of failure is diminished, it's reduced, with both the knowledge and the experience and the expertise of Senior Planning Services is put into play for every application.**  If you have any questions about qualified income trusts, if you have any questions about Medicaid in general, feel free to call us at 7…855-775-2664.").

49.    SPS's pre-2016 New Jersey Fee Agreement,[25] however, specifically stated that the "Applicant acknowledges and agrees that Senior Planning Services does not provide any legal service or advice and Applicant is not relying on Senior Planning Services to furnish any legal services or advice."  *See* Exhibit C, ¶ 8.

50.    Instead, SPS's pre-2016 NJ Fee Agreement stated that its purpose was "to guide, oversee, and assist in the Medicaid application process for the purpose of obtaining a determination of Medicaid eligibility for the Applicant _____ ("Applicant") in the State of ____."  *Id.*, ¶ 1.

---

[25] Upon information and belief, this pre-2016 NJ Fee Agreement is the same as that which as used throughout the other states in which SPS operates.

51.    Paragraph 4 of the pre-2016 NJ Agreement, "Fees," stated that the client was to pay SPS a non-refundable and non-negotiable fee of $5,000, which was "strictly for Senior Planning Services LLC's assistance in preparing and filing a complete Medicaid application." *Id.*, ¶ 4.  It also stated that that the payment was not "dependent upon (i) completion and/or submission of a Medicaid application (unless the failure to complete and submit the application is solely the fault of Senior Planning Services, LLC) or (ii) a determination of Medicaid eligibility."  *Id.*

52.    There is no mention anywhere in that pre-2016 SPS Fee Agreement of any involvement of Price & Price, or any other law firm.  In fact, in Paragraph 5, it states:

> I am aware that there are circumstances under which the Medicaid application process requires the analysis, interpretation, or advice of a third-party consultant (i.e. accountant, lawyer, etc).  In the event that Senior Planning Services, LLC determines that third-party consulting services are necessary for the application process, Senior Services, LLC [sic] will notify me prior to engaging the third-party consultant, however, I acknowledge my responsibility to pay for the costs of any third-party consultant.

> *Id.*

53.    Then, in May 2016, after receiving an inquiry concerning the permissible activities of non-lawyer Medicaid advisors, the Committee on the Unauthorized Practice of Law (appointed by the Supreme Court of New Jersey) held that non-lawyers and companies that are not law firms who receive payment or compensation for their services, and/or provide advice regarding Medicaid eligibility, are practicing law.  *See* Exhibit A.  When non-lawyers engage in these practices, the Committee noted, "such unauthorized practice of law is not only a criminal offense, *N.J.S.A.* 2C:21-22, it also may violate the Consumer Fraud Act, *N.J.S.A.* 56:8-1 *et seq.*" *Id.* at 1.

54.    The Committee recognized that, according to 42 C.F.R. Section 435.908, States "must allow individual(s) of the applicant or beneficiary's choice to assist in the application process or during a renewal of eligibility."  42 C.F.R. Section 435.923(a)(1).  Additionally, States must permit applicants and beneficiaries to "designate an individual or organization to act responsibly on their behalf in assisting with the individual's application and renewal of eligibility and other ongoing communications with the agency."  *Id.*  In addition, States may certify staff and volunteers to act as application assistors, though those assistors may not receive payment or compensation for their services.  42 C.F.R. Section 435.908(c).  *See* Exhibit A, at 2-3.

55.    However, the Committee also acknowledged that though non-lawyer Medicaid advisors may provide "limited services," they also held that:

> it is the unauthorized practice of law when non-lawyers provide advice in matters that require the professional judgment of a lawyer.  Hence, only a lawyer may provide legal advice on issues such as strategies for Medicaid eligibility, including provisions of wills and powers of attorney; on the need for guardianships and the authority to transfer assets; on nursing home laws; on transfers of property; on the impact of marriage and divorce; and on estate administration and the elective share.

*Id.*, at 3.

56.    In other words, the Committee held that an advisor may assist with the Medicaid application or renewal, such as by counting income or assets, but it "may not provide legal advice on strategies to become eligible for Medicaid benefits, including advice on spending down resources, tax implications, guardianships, sale or transfer of assets, creation of trust or service contracts, and the like."  *See id.*, at 5.

**2. SPS still continues to market itself as providing, and indeed does provide, legal services.**

57.    Following this 2016 decision, SPS only slightly revised its New Jersey Fee Agreement, in relevant part, to add a line to Paragraph 4, "Fees," in which the client agreed to

pay a certain amount (left blank on the form contract) to the law firm of Price & Price LLC "for providing legal services in connection with the Medicaid application. Payment should be made payable to Senior Planning Services and Senior Planning Services will forward payment to Price & Price LLC on my behalf." *See* Exhibit B, at ¶ 4.

58.     Paragraph 5, "Expenses," of the NJ Fee Agreement also added a sentence stating that "I understand that I may engage any third-party consultant of my own choosing," though it retained language stating that if SPS determined that "third-party consulting services are necessary for the application process, Senior Planning Services will notify me prior to engaging the third-party consultant." *Id.*

59.     SPS did not make any meaningful or substantive changes to Paragraphs 1 ("Purpose"), 3 ("Obligations of the Parties"), or 8 ("No Legal Advice or Services") from the pre-2016 Fee Agreement.[26]

60.     Although the addition of the Price & Price firm to the SPS NJ Fee Agreement (and perhaps, other law firms not known to Plaintiff now) was intended to add legitimacy to the contract and to SPS's services in that state, in reality, SPS continues to advertise that **it itself** is eligible, and does provide, such services. For instance:

> a.  SPS's New Jersey page continues to market itself as providing exactly the same
>     services to the public as SPS purported to provide *before* the May 2016 Decision.
>     *See*  https://www.senior-planning.com/new-jersey-medicaid-planning-eligibility/,
>     and at Exhibit D. Though SPS revised its New Jersey website to remove language
>     stating that SPS assisted families "with… the spend-down procedure" or "guide

---

[26] Plaintiff submits that the post-2016 contract is void for lack of consideration. Paragraph 6 states that payment to SPS is not dependent upon (1) completion and/or submission of a Medicaid application; (2) a determination of Medicaid eligibility; and/or (3) the acceptance or denial of the Medicaid application. *Id.* Accordingly, despite the Agreement's stated purpose of assisting the Applicant in filing the Medicaid application and performing follow-up activities related to the Medicaid application process as is necessary for obtaining a Medicaid eligibility determination, Paragraphs 4 ("Fees") and 6 ("No Guarantees") not only contradict that purpose but make clear that the SPS "clients" must pay $6,500 regardless of whether SPS meets its obligations or performs the "purpose" of the Agreement. *Id. Compare* Exhibit B, at ¶¶ 1 and 3, *with* Paragraphs 4 and 6. And, in many cases, SPS did not perform anything in exchange for this payment. *See infra*, note 30.

families through the spend-down process," it continues to represent that it will **"assist families in utilizing excludable resources" and "assist clients in the process of liquidating life insurance policies, annuities and stocks etc."** *Compare* Exhibit O, [pre-2016 website] with Exhibit D [post-2016 website]. Clearly, assisting a family with the "utilizing" of excludable resources, or "liquidating" life insurance policies, annuities, or stocks in conjunction with a Medicaid application, qualifies as the provision of legal advice as a strategy for Medicaid eligibility and was not the type of assistance contemplated under 42 C.F.R. § 435.908(c)(2).

b.  Further, although SPS was careful to change its New Jersey page, its Connecticut, New York, and Pennsylvania pages all continue to represent that **SPS will guide families through the "spend-down process,"** with the New York website even stating that it will outright "**provide guidance with asset preservation**." *See* NY, PA, and CT website pages, at Exhibits E, F, and G.

c.  Indeed, on another page of its current website, specifically titled "What is a NJ Qualified Income Trust," https://www.senior-planning.com/nj-qualified-income-trust/, a true and correct copy of which is attached hereto as Exhibit R, SPS sets out a lengthy explanation of a New Jersey Qualified Trust and then specifically instructs readers **_not_** to hire a lawyer to obtain advice on this topic but instead to hire SPS:
    ▪ "The trust need not be set up by an attorney."
    ▪ "For questions regarding a Qualified Income Trust or for a *free* Medicaid consultation contact Senior Planning Services at: 1855.S.Planning (775-2664)."

d.  In addition, Senior Planning's general "Document Definitions" section of its website, https://www.senior-planning.com/document-definitions/, a true and correct copy of which is attached hereto as Exhibit "S," provides a definition of Medicaid-related topics, and then, for each one tells prospective clients that they can be advised and receive the assistance they need with respect to each of these topics by approaching SPS, *e.g.*:
    ▪ "For assistance with the Medicaid spend-down and the liquidation of Life Insurance policies…"
    ▪ "For assistance with your pension in conjunction with Medicaid…"
    ▪ "For questions about deed transfers for Medicaid purposes…"
    ▪ "For questions about Special Needs Trust in conjunction with Medicaid…"
    ▪ "For assistance with your Medicare requirements in conjunction with Medicaid…"
    ▪ "For assistance with the Medicaid spend-down and the liquidation of annuities…"
    ▪ "For assistance with the Medicaid spend-down and the liquidation of stocks or bonds…"
"… reach out to Senior Planning Services at 1.855.S.PLANNING or (1.866.529.6587)."

e.  That same page (Exhibit S) also provides a definition of a Power of Attorney and creation of a guardianship relationship, and again directs prospective clients to SPS for preparation of an instrument creating that relationship:

- ▪ "A power of attorney is a legal document in which one individual gives the rights to another to act as an agent on their behalf. This may be used for financial or health matters. For assistance with a Power of Attorney in conjunction with Medicaid, reach out to Senior Planning Services at 1.855.S.PLANNING or (1.866.529.6587)."

- ▪ "A guardian is someone who is legally responsible for the care and well-being of an individual who is incompetent or a minor. For assistance with a guardianship in conjunction with Medicaid, reach out to Senior Planning Services at 1.855.S.PLANNING or (1.866.529.6587)."

f.  At the bottom of this page SPS emphasizes the complexity of all of these issues and then identifies SPS as the providers of advice that will enable senior citizens to navigate the complexities successfully:

- ▪ "The Medicaid eligibility application process is often frustrating for applicants and their families. The risk of failure is real. The cost of failure can be financially devastating. This is why you need Senior Planning Services on your side.  When a loved one is in need of long term care, it is likely that there are numerous challenges to contend with. The added stress synonymous with the Medicaid eligibility application process is an unwelcome burden further compounding existing difficulties.  Senior Planning Services is the ultimate solution for optimized Medicaid eligibility. Thousands of Medicaid applicants and their families have relied on the expertise of Senior Planning Services. With Senior Planning Services, the promise of a secure financial future becomes reality for qualified applicants. Call us today for your free Medicaid consultation." *Id.*

g.  In an email exchange between a Rhode Island attorney and a Senior Planning Intake Support employee, the attorney asks if Senior Planning can "advise [her] with the spend down process or do I need a RI attorney for that in addition to your company?"  *See* March 15, 2018 email exchange, attached hereto as Exhibit "T," at p. 5.  In response, the Senior Planning employee answers, "**We can definitely advise and guide on the spend down process**."  *Id.* (emphasis added).

h.  SPS also continues to hold itself out as providing complex legal services at conferences of its peers.  At the most recent Health Care Association of New Jersey conference in Atlantic City (October 2018), an SPS booth stated: "The Medicaid Process. SIMPLE.  Prevent Periods of ineligibility. **Curtail spend-down mishaps.**  Achieve faster Medicaid approvals" (emphasis added).  *See* Exhibit H.

20

    i.  Finally, SPS continues to hold out to the public that (i) applying for Medicaid is a complex matter fraught with the possibility that wrong choices will be made that will adversely affect the applicant and his or her family, and that (ii) SPS understands all of these complexities and can provide advice that will enable the applicant and his or her family to make the best choices so that the Medicaid application process is navigated safely:

> ▪ In an interview with SPS Executives Ben Mandelbaum, Michael Steinberg, Meir Kaplan and Isaac Itzkowitz, 77 WABC "Mind Your Business", April 2017 (https://www.mybradio.com/executives-of-senior-planning-services/), Mr. Kaplan explained in depth how SPS could assist individuals with complex financial vehicles such as a promissory note, or spousal refusal, in order to retain assets and continue qualify for Medicaid. *See id.*, at 15:30 ("You're not allowed to go ahead and gift in the 5-year lookback period. Any amount that was gifted for someone in the 5-year lookback period for someone going into a nursing home, can be a penalty… **There is a legal way today, which is called a promissory note,** if you look it up online, it's either called a halfsies rule, or the split rule…"); at 17:12 ("Spousal impoverishment which comes up on a daily basis… So the way Medicaid allows her to do is something called a spousal refusal. Which enables the community spouse to pretty much… allows her to do is… financially separate herself from her loved one, going into a nursing home. Which, Medicaid looks at it almost like a single case. So if it's a single case, the community spouse gets to keep most of the assets, as a single case, he would be Medicaid eligible as of today, Medicaid would then pick up his bill entirely and the community spouse would not be affected too much."); and at 14:59 (**"If someone would like more information on protecting home, or protecting assets, and the few different types of trusts, again we can be reached at 516-500-SENIORS, or on our website…"**).

61.    These statements and interviews make absolutely clear that SPS is now, just as it did before the May 2016 Decision, continuing to hold itself out to the public as a provider of advice on the purely legal topics which SPS identifies – the best method of spending down assets, the creation of trusts, guardianship relationships, and a Power of Attorney. Advice on all of these issues is legal advice, which SPS is not authorized to render.

62.    However, as stated, *supra*, SPS's Fee Agreements (both pre-2016 and revised) do **not** represent that SPS will provide such legal and/or financial advice, instead suggesting that SPS will faithfully adhere to 42 CFR § 435.908(c)(2), *i.e.,* by merely assisting an individual to

complete and file a Medicaid application.  Indeed, SPS's addition of Price & Price to the NJ Agreement, and its addition of language to Paragraph 5 of the NJ Agreement stating that the Applicant can "engage any third-party consultant of [his/her] own choosing," suggests that if necessary, it would recommend *lawyers* to provide this advice.  *See* Exhibit B.

63.    And yet, the inclusion of Price & Price, or any other law firm in the Fee Agreement does not and cannot provide SPS any defense, as it is a mere sham arrangement.

64.    First, SPS never makes any mention of Price & Price, or any law firm with which it partners, in any of its marketing materials.[27]

65.    Second, Price & Price's fee is an amount which could not possibly cover any meaningful amount of legal work.  For instance, at the point of retention, Applicants are also required to sign a separate Agreement to Provide Legal Services.[28]  In Plaintiff's case, this additional form contract stated that the "legal fees" to be paid to Price & Price totaled $325, which were to be collected by SPS and forwarded to that firm.[29]  At the end of that form, the contract reads, "You have read and agree to the terms set forth above.  <u>If you had questions they were answered to your complete satisfaction.</u>"  (Emphasis added).  If this contract seems at best odd and at worst illegal or unethical, it is for good reason: the attorney fee arrangement is a peppercorn contract, orchestrated for the sole purpose of avoiding consumer fraud claims and criminal prosecution.

---

[27] The only exception is that SPS does include one attorney "testimonial" on its website, which is penned by Ira S. Karlstein, and states: "[t]heir volume of applications give them the exposure to a range of issues that most law firms cannot experience," insinuating that SPS actually knows *more* than lawyers.  *See* Karlstein testimonial, a true and correct copy of which is attached hereto as Exhibit "U."  Ironically, Mr. Karlstein was admonished by the New Jersey Disciplinary Review Board for distribution of printed materials that contained false and misleading statements about the benefits of living trusts and the dangers of probate at a seminar, violating RPC 7.1(a) and Opinion 25 of the Committee on Attorney Advertising, 153 N.J.L.J. 1298 (1998).  *See* excerpts from *In the Matter of Joseph Rakofsky, Attorney at Law,* DRB 15-021, a true and correct copy of which is attached hereto as Exhibit "V."
[28] *See* Price & Price Agreement to Provide Legal Services, as contained within the SPS Fee Agreement Packet, at p. 4.
[29] As evidenced by Mr. Cotton's May 31, 2018 bank statement, the full amount of $6,500 was debited by SPS.  *See* Cotton May Bank Statement, a true and correct copy of which is attached hereto as Exhibit "W."

66.     Third, Plaintiff's experience makes clear that Price & Price never did any significant work on this case, and upon information and belief, for others' cases either.

67.     Plaintiff entered Cinnaminson Center, a Genesis HealthCare facility ("Genesis") located at 1700 Wynwood Drive, Cinnaminson, New Jersey, in early March 2018 as a result of a fall he endured at his house, located in Riverside, NJ.

68.     Plaintiff was paying privately for rehabilitation at Genesis through his private insurance company.  However, Genesis was in contact with Plaintiff's daughter, Ms. Jennifer Cotton (also his power of attorney), regarding qualifying for Medicaid, as it became clear that Plaintiff would need to stay at Genesis to receive long-term care services.

69.     In fact, in mid-April, a representative from Genesis's business office contacted Ms. Cotton, insistent that she come in for a meeting to meet with **one of their contractors, SPS,** so that SPS could "assist" Plaintiff to become Medicaid-eligible.

70.     On April 26, 2018, Ms. Cotton attended what she thought was a simple informational meeting with SPS Executive Michael Steinberg <u>without her father being present</u>. At that meeting, Ms. Cotton was told that SPS would be helping her father to obtain Medicaid. Mr. Steinberg did not explain any particulars regarding the Medicaid application process and asked only that Ms. Cotton sign some documents to engage their services.  Mr. Steinberg never once mentioned that her father might not qualify for Medicaid; nor that as part of the services, she was hiring an attorney; nor that Ms. Cotton had signed a limited durable power of attorney. Though she didn't feel comfortable doing so, Ms. Cotton was made to feel like she didn't have a choice.  Ms. Cotton also recalls that the form contracts were incomplete at the time of the meeting, in that they "were not filled in."

71.     Following her signing the incomplete forms, Ms. Cotton and Mr. Steinberg visited Plaintiff in his room.  Mr. Steinberg dialed Plaintiff's financial institutions and placed him on the phone to inquire into the amount of his assets.  During these phone calls, Mr. Steinberg waived his hand in front of Plaintiff's face to indicate to him to "hurry up," and was generally disrespectful.

72.     Following this meeting, Ms. Cotton felt uneasy about SPS's involvement with her father, and she requested the documents she had signed from Mr. Steinberg via text message. *See* attached April 27, 2018 and May 3, 2018 text messages, true and correct copies of which are attached here to as Exhibit "X."  She also returned to Cinnaminson Center on April 27 to speak to the Business Office, and told the Manager that she was not comfortable with what had transpired at the SPS meeting.  The Business Office Manager assured her that SPS could be trusted and that she worked with the company all the time.

73.     At that point, Ms. Cotton still had not given Mr. Steinberg the required SPS fee totaling $6,500, and he continued to request Plaintiff's bank account information so that he could debit Mr. Cotton's account.  Ms. Cotton never gave Mr. Steinberg any of Plaintiff's bank account information, yet on May 9, 2018, Mr. Steinberg, on behalf of SPS, debited Plaintiff's bank account in the amount of $6,500.  *See* Exhibit W.

74.     On May 23, 2018, Ms. Cotton received a copy of Price & Price's "Spend-Down Analysis and Recommendations Report, attached to a letter dated May 14, 2018 (addressed to Ms. Cotton, c/o "Senior Planning Services," though never sent to Ms. Cotton at her home address on that date).  *See* May 23, 2018 Email and attached Price & Price Spend-Down Analysis, a true and correct copy of which is attached hereto as Exhibit "Y."

75.     Following Ms. Cotton's engagement of another attorney, Ms. Cotton wrote to SPS by email on May 25, 2018 to terminate the relationship and request a refund.  *See* May 25, 2018 email, a true and correct copy of which is attached hereto as Exhibit "Z."  Ms. Cotton also followed up on this email with a letter on May 29, 2018, again terminating SPS's services and also requesting a copy of her father's file.  *See* Cotton May 29, 2018 letter, attached hereto as Exhibit "AA."

76.     Ms. Cotton did not hear from SPS until July 12, 2018, when they responded to offer her a "partial refund."  *See* July 12, 2018 email, a true and correct copy of which is attached hereto as Exhibit "BB."  On July 13, 2018, Ms. Cotton's new attorney, Jerry Rothkoff, Esquire, contacted SPS to request a *full* refund for Ms. Cotton (on behalf of Plaintiff).  SPS again responded by offering to refund Ms. Cotton half of her fee, but not the full amount she is due. *See* July 13, 2018 Email from Samuel A. Tversky, Esq. Email, a true and correct copy of which is attached hereto as Exhibit "CC."

77.     In an undated letter, sent on or around July 27, 2018, SPS sent Ms. Cotton a copy of her file.  *See* undated SPS letter, a true and correct copy of which is attached hereto as Exhibit "DD."

78.     A review of the Price & Price May 14, 2018 "Spend-Down Analysis and Recommendations Report" indicates that little to no legal work was performed on Plaintiff's case, or his Medicaid application (not that it could, as Plaintiff would never have qualified for Medicaid).  Despite having never been contacted by the attorney who wrote the report, and having given them absolutely no documents, the Price & Price attorney made extremely vague and confusing recommendations, and then requested an *additional* fee of $6,500 to "develop and

assist with implementation of a Long-Term Care Strategy," **which are exactly the services Ms. Cotton purchased in the first place from SPS.** *See* Exhibit Y at Page 5.[30]

79.    In short, following the May 2016 Committee on the Unauthorized Practice of Law, SPS continued to illicitly represent it could provide legal advice to its clients, while failing to correctly represent this in its Fee Agreement.  The addition of a law firm was a mere sham intended to further deceive its clients, and the legal community, into believing it was following the law.

**D.    SPS's Material and Undisclosed Relationship With the Long-Term Care Facilities**

80.    SPS's deception spreads even deeper, for it is also tricking Medicaid Applicants into believing they are the clients, when SPS's true clients are actually the long-term care facilities—whose interests are, in very important respects, at odds with those of SPS's nominal senior citizen "clients."  In fact, the long-term care facilities benefit from SPS's services because, with SPS's assistance, the facilities believe they will not experience any gap in payments, and they will attempt to maximize the higher private payment prior to Medicaid eligibility.

81.    Due to this conflict of interest, SPS is more likely to recommend that the Applicant's assets should "spend down" their assets to the facilities, rather than to recommend the Applicant use that money towards a qualifying financial vehicle.  In all cases (even if not

---

[30] Indeed, many clients (such as Plaintiff) never actually received any services from SPS, despite paying exorbitant fees in excess of $6000.  In fact, SPS's entire business model is premised upon having its clients pay them an up-front, flat fee to assist the elderly client in completing the Medicaid application.  However, at that point, SPS has no idea nor basis to know whether the client could, at that point (or at any point) qualify for Medicaid.  Though SPS's contract seeks to absolve itself from having to perform any work in exchange for this initial fee (described above in Paragraphs 51-52) even a cursory review of Plaintiff's financial situation would have revealed that clients such as Plaintiff couldn't currently qualify for Medicaid, that spend-down could not occur within any reasonable period of time, and thus that SPS's "services" would be superfluous.  Instead of advising such potential clients to apply for Medicaid at a later date (during which interim period the client might be sent home from the facility, or could pass away), SPS took these people's money with the knowledge that they would likely be unable to do any work for them at that time.  In this way, SPS induced unsuspecting and often desperate clients to pay them, all the while knowing that they may not actually provide any resultant services and that the client would also eventually need legitimate (and likely costly) legal advice for spend-down to occur.  This pattern and practice alone constitutes misleading, deceptive and fraudulent behavior.

evident to the elderly client), the financial advice was given for the sole purpose of benefiting Defendants and their long-term care facility clients, and not their elderly clients. This has resulted in negative, often catastrophic, financial consequences for clients and their family members, and may have even delayed eligibility for the very Medicaid services SPS claimed to be assisting with. And, in some cases, SPS clients who received Medicaid services were later determined to have transferred their assets in violation of the law, incurring a transfer penalty.[31]

82.     As noted, *supra,* SPS markets itself on its website as experts in Medicaid planning for **families and potential Medicaid applicants**. As just one example, its New Jersey website states the following on its homepage:

> At Senior Planning Services, we simplify the Medicaid eligibility, application, and approval process to alleviate much of your stress and anxiety. We offer more than just sound advice- we implement it.
>
> Our comprehensive services are focused on helping families receive the Medicaid benefits they deserve. We streamline the entire process, starting with an initial consultation and assessment. Then we assist with statements and paperwork, fill out applications on your behalf, and act as a liaison with the State of New Jersey's Medicaid eligibility department. We'll be by your side until you receive your official approval.

*See* Exhibit D (emphasis added).

83.     An undated SPS advertisement also touts its services as free of charge, stating that "[y]our free Medicaid consultation is a phone call away." *See* Exhibit M, at 1. SPS also holds many free seminars at long term care facilities. *See* August 20, 2018 SPS Facebook post, a true and correct copy of which is attached hereto as Exhibit "EE."

84.     However, and in direct contrast, certain of SPS's advertisements direct its services at the long-term care facilities themselves, implying that these entities, rather than the Medicaid

---

[31] *See V.R. v. Camden County Board of Social Services,* 2017 WL 1900663 (N.J. Adm. Apr. 28, 2017) (holding transfer penalty of $118,048 penalty would hold, in which Petitioner had hired Senior Planning Services to complete her Medicaid paperwork. Petitioner was represented in proceedings by a Price and Price attorney).

applicant, are SPS's actual clients.  For instance, **SPS noted in an undated print brochure that its mission is "to solve the AR challenges of Medicaid for long term facilities**." *See* Exhibit K, at "Overview," p. 3 (emphasis added).  This language continues throughout that document:

1. "Through optimized Medicaid eligibility, long term care facilities are better able to serve their residents… Facilities will often absorb losses when Medicaid applicants do not get approved for Medicaid coverage." *Id.*, at p. 4.

2. Under "Medicaid Ineligibility Common Causes," it lists "Failure to provide required documentation," stating that "Facilities are robbed of revenues when these failures occur." *Id.*

3. Under "Additional Concerns," it states "Facility Cash Flow is negatively impacted when there are large outstanding Medicaid pending receivables.  A slow Medicaid approval is a drain on facility cash flow." *Id.*

85.    This print ad further implies that SPS has a strategy to ensure long-term care facilities' clients to participate in the program.  As it states in the FAQ section on page 6: "Q: How do long term care facilities ensure that applicants participate in the free consultation program? **A: Senior Planning Services offers a comprehensive yet easy to implement solution to help facilitate widespread participation in the free consultation program."** *Id.*, at p. 6 (emphasis added).  A recent SPS brochure directed to long-term care facilities also states that, as a solution to the challenges of Medicaid, SPS "**instils [sic] a sense of urgency during the education.**" *See* Exhibit L, at p. 3.

86.    In December 2014, a recorded interview with Neil Stern, Director of Marketing, Senior Planning Services, "NJ Medicaid and Qualified Income Trust," depicts Mr. Stern giving a talk in front of an SPS booth, instructing how individuals can set up a qualified income trust for purposes of Medicaid eligibility.  *See* https://www.youtube.com/watch?v=cnNzsMARETo.  At the end of the video, Mr. Stern exits the frame, revealing the booth's sign behind him: "Senior Planning Services. The Solution. **To Optimize Medicaid Eligibility at Your Facility."**

87.    More recently, a combined SPS/LTC exhibit booth from the March 2017 Health Care Association of New Jersey conference in Atlantic City advertises SPS's services: "Optimize Medicaid Eligibility. **At *No* Cost to Your Facility**… Expedite Medicaid Approvals, Improve Your Facility's Cash Flow." *See* March 2017 HCANJ photograph, a true and correct copy of which is attached hereto as Exhibit "FF" (emphasis added).

88.    In another interview video, posted on November 13, 2017, https://www.youtube.com/watch?v=YEdV-GkdPwI, entitled, "An Innovative Solution to Address the Challenges of Medicaid," Mr. Steinberg states, at :27: "**So our individual clients are faced with [the burden of gathering documentation and providing proper verifications], and the clients in the skilled nursing facilities are faced with the burden of not getting paid, quite frankly, and that's a pretty large burden in itself… As far as our clients in the skilled nursing facilities, again, you have a company to rely on to make sure everything is being put together, everything is going to be submitted complete, and to make sure that you are going to be paid for the services that you provided to these families as your patients**."

89.    As these materials make clear, SPS/LTC's goal for its long-term care facility clients is to get nursing home patients into Medicaid as quickly as possible because Medicaid eligibility is determined, in significant part, by whether an applicant's assets have been spent down.  If assets are spent down illicitly, such as through gifts within that five-year lookback period, the applicant will be injured through penalties.  But, the applicant will may still be granted Medicaid benefits, so long as the penalties are paid.  This means that the interests of the long-term care facility and those of the Medicaid applicant are in tension with one another, because the facility's interest is in having the applicant attain Medicaid benefits regardless of the penalties incurred along the way, while the applicant bears the penalties.  Therefore, no objective

advisor can effectively represent the interests of both of these constituencies at the same time. SPS/LTC does so, however, while only one side – the facilities – even knows that both sides are being represented simultaneously.  And only one side – the facilities – has any awareness of this conflict of interest.

90.     It is SPS's sister company, LTC, who has access to the long-term care facilities' prospective and current patients' financial and health information.   From that data, upon information and belief, LTC identifies individuals who are not currently Medicaid-qualified, and they (or the long-term care facilities) refer those clients (with or without their knowledge) to SPS.  This is evidenced by a recent email exchange from Michael Steinberg, Director of Business Development at SPS, to an unknown, named employee of Atrium Health Group (a company which operated 44 post-acute care and senior living centers in Michigan, Wisconsin, and New Jersey (more than one-quarter of those facilities (12/44) are located in New Jersey):

1. Upon admission, any long-term or possible long-term admission, not currently on Medicaid, shall be referred to Senior Planning.  We should be utilizing the UR meeting as a safety net for those patients that were not referred upon admission.
2. *We recommend adding a Senior Planning Referral form to each admission packet.*
3. Any LT [long-term] patient that is currently paying privately regardless the amount of assets remaining should be referred to SPS.
4. Making a referral is as simple as filling out an online referral form at referrals.senior-planning.com or you can email the referral in.  It is imperative that SPS reach out to the family as opposed to relying on the family to call SPS.
5. Every referral will initiate a free Medicaid consultation for the family to gain a better understanding of the Medicaid process.
6. Senior Planning will provide the facility with invaluable feedback on potential issues.
   - Provide the facility with updates throughout the process
   - Provide Monthly Status Reports

*See* Email of Michael Steinberg, Director of Business Development, to Atrium employees, a true and correct copy of which is attached hereto as Exhibit "GG."[32]

91.     Upon information and belief, as only LTC (and not SPS), would have cause to attend a "UR" (Utilization Review) meeting with the facility staff, this indicates that SPS and LTC are intextricably linked, and that they also work in tandem to cull information from the facilities to identify their clientele.

92.     LTC's and SPS's sharing of these individuals' personal information,[33] is not only indicative that the long-term care facilities themselves are the true clients of SPS, but it is, in and of itself, a violation of the Health Insurance Portability and Accountability Act ("HIPAA")[34], and thus a violation of New Jersey privacy law.[35]

### E.     Defendants' Enterprise

93.     SPS advertises that it will assist Medicaid Applicants with providing legal advice on issues such as strategies for Medicaid eligibility (spending down or sale/transfer of assets, tax implications, guardianships, or the creation of trusts or service contracts) to current patient and prospective patient clients in New Jersey, and in other states, via interstate commerce such as internet, print (*see* Exhibits D-G, L-T, and EE) and radio and video interviews published on the internet, *supra* at ¶¶ 60, 84, and 86.

---

[32] Ms. Cotton's attorney, Mr. Rothkoff, received a printout of this anonymous email (with the handwritten notes) via USPS mail on January 2, 2019. The document arrived with no information identifying the sender and with no return address.

[33] In the process of signing up an individual as a client, SPS requires its clients to sign a Release of Information form, attached as Appendix A to its Fee Agreement. *See* Exhibit B. The Release of Information form, when executed, allows SPS to "communicate with, provide information to, and obtain information from state and county Medicaid caseworkers and other financial services providers (*i.e.*, banks, insurance companies, etc.) **for the purposes of determining the eligibility status and obtaining Medicaid benefits for the Applicant.** Nothing in the Release would allow LTC to share information with SPS *prior to* the Release being signed.

[34] 42 U.S.C. § 1320(d), *et seq.*

[35] *See Smith v. Datla*, 164 A.3d 1110 (N. J. Super. 2017) (holding that patient plaintiff's claim against doctor for invasion of privacy, based on doctor's disclosure of patient's HIV-positive status to third party, could be brought as common-law invasion of privacy claim).

94.    LTC advertises its billing and administration services to its long-term care facility clients in New Jersey, and in other states, via interstate commerce such as internet, print, and radio advertisements.

95.    Long-term care facilities advertise for patient clients in New Jersey via interstate commerce (*i.e.*, as Genesis and Atrium Health did through their websites and through print literature).

96.    SPS tells its prospective patient clients that not only will it help them fill out the forms, but it will also help "place" them (or their loved ones) in a long-term care facility.[36]

97.    SPS tells those long-term care facilities with which it maintains contracts to include SPS "referral forms" in every admission packet.  *See* Exhibit GG.

98.    SPS (and LTC) use the long-term care facilities' utilization review meetings as "a safety net for those patients that were not referred upon admission."  *Id.*

99.    Upon information and belief, LTC also passes HIPAA-protected information to SPS to further identify potential clients, even though SPS is not yet permitted to have that information because no Fee Agreement has yet been signed.

100.    Upon information and belief, Defendants coerce clients into signing Fee Agreements (and accepting their initial, non-refundable, fee money), even when they knew, should have known, or suspected the applicant would not qualify for Medicaid within a reasonable amount of time, or without additional legal or financial advice.

101.    Even when clients could qualify for Medicaid or other benefits, upon information and belief, Defendants advised managing or transfer of Plaintiff's and the Class's assets in ways

---

[36] *See* https://www.mybradio.com/executives-of-senior-planning-services/, at 9:36 (describing "placement process"), and https://www.senior-planning.com/senior-nursing-home-placement-services/.

that did not maximize the long-term health of their clients' assets, for either themselves or their surviving spouse or dependents.

102.    In fact, upon information and belief, Defendants perpetrated a system in which the first priority was to "spend-down" their clients' assets (either by having the applicant pay money to SPS or to the long-term care facilities), and therefore they *failed* to provide correct financial advice to Plaintiff and the Class, its actual clients, such as by transferring a home or other resources to a disabled child or trust for sole benefit of a disabled child, child care-giver or co-owner sibling, or by setting aside funds through "gift and return" or "gift and annuitize" strategies.

103.    And, while perpetrating this fraud, Defendants intentionally concealed from their clients facts sufficient to arouse suspicion of the existence of claims that Plaintiff and the Class now assert.  Plaintiff or the Class was not alerted to the existence and scope of Defendant's industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.  Through its public statements, marketing, and advertising, Defendant's deceptions deprived Plaintiff of actual or presumptive knowledge of facts sufficient to put them on notice of potential claims.

104.    By engaging in the course of conduct set forth and described above at length, Defendants' agents and employees have violated New Jersey law, including (but not limited to), the New Jersey Consumer Fraud Act ("CFA") and New Jersey privacy law, as well as the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), in the following ways:

       a.   Unconscionably, deceptively, and/or affirmatively misleading Plaintiff and the Class to believe that they are authorized to provide legal services, and to pay for those services, when in fact they are not legally permitted to do so, under federal and state law.

33

b. Unconscionably, deceptively, and/or affirmatively misleading Plaintiff and the Class to believe that they are representing Plaintiff and the Class's best financial interests, when in fact they are operating in the interests of themselves and the long-term care facilities.

c. Unconscionably, deceptively, and/or affirmatively misleading Plaintiff and the Class into believing their advice was sound, when in fact that advice did not maximize the long-term health of their assets, but actually harmed them.

d. Unconscionably, deceptively, and/or affirmatively misleading Plaintiff and the Class into signing a Fee Agreement and paying initial fees, when they knew, or should have known, the clients would not currently qualify for Medicaid;

e. Otherwise engaging in commercial conduct deemed unlawful in New Jersey; and

f. Violating New Jersey privacy law by sharing information protected under HIPAA between themselves and using said information to identify potential clients for themselves;

105.    Plaintiff therefore alleges that the conduct of Defendants and its agents, employees, officers, directors, servants, and/or other representatives constitute violations of New Jersey law, including, but not limited to, the CFA and TCCWNA, and federal RICO law, and gives rise to Defendants' liability for the claims set forth herein below.

## CLASS ACTION ALLEGATIONS

106.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

107.    The Class claims all derive directly from a single course of conduct by Defendants.  Defendants engaged in uniform and standardized conduct toward the Class.  They did not differentiate, in degree of care or candor, their actions or inactions among individual Class members.  The objective facts are the same for all Class members.  Within each Claim for Relief set forth below, the same legal standards under New Jersey and/or federal law govern.  Accordingly, Plaintiff brings this lawsuit as a Class Action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rule of

Civil Procedure 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

108.    Plaintiff seeks to certify a Class defined as follows:

Any individual who contracted with Senior Planning Services, LLC, through the date of entry of any class certification order (the "Class Period").

109.    Plaintiff seeks to certify the above-defined Class for all causes of action alleged herein.

110.    The prerequisites to maintaining a class action under Fed. R.Civ. P. 23(a) and (b) are met for the following reasons:

A.    **Numerosity:** Upon information and belief, Plaintiff states that there are thousands of individuals who contracted with SPS.  Therefore, the proposed Class is so numerous that joinder of all individual members is impractical.

B.    **Commonality:** Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to Plaintiff and the Class Members are:

i.    Whether and the extent to which Defendants misrepresented their own ability to provide legal assistance, and the need to secure legal counsel for asset planning purposes;

ii.    Whether SPS's Fee Agreements are void or voidable for lack of consideration;

iii.    If SPS's Fee Agreements are valid, whether they should be rescinded due to the insufficiency or failure of consideration;

iv.    Whether and the extent to which Defendants misrepresented to their potential clients the process of applying for Medicaid benefits, as well as the spend-down procedure and necessity of transfer of assets;

v.      Whether and the extent to which Defendants misrepresented to their clients the conflicts of interest existing between themselves and the long-term care facilities, and the client;

vi.     Whether and the extent to which Defendants' conduct described throughout this Class Action Complaint created a significant likelihood of confusion and/or misunderstanding over the Medicaid application process and accompanying financial planning services;

vii.    Whether and the extent to which Defendants failed to comply with the written guarantees and/or warrantees in their Fee Agreements;

viii.   Whether and the extent to which Defendants mislead clients into signing Fee Agreements while they knew, or should have known, those clients would never qualify for Medicaid;

ix.     Whether and the extent to which Defendants have been unjustly enriched at the expense of Plaintiff and the Class;

x.      Whether and the extent to which Defendants violated the Class's privacy rights by sharing private and HIPAA-protected information amongst themselves and other entities;

xi.     Whether and the extent to which Defendants participated in a civil conspiracy between themselves and with long-term care facilities towards the common purpose of deceiving and misleading its clients;

xii.    Whether Defendants violated 18 U.S.C. § 1961, *et seq*.; and

xiii.   Whether and the extent to which Defendants engaged in a pattern of racketeering activity.

C.    **Typicality:** Plaintiff's claims are typical of the claims of Class Members because every individual client contracted with Defendants. As such, the claims or defenses of the representative parties are typical of the claims or defenses of the class.

D.    **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained counsel competent and experienced in complex class action litigation and with adequate

resources to assure the interests of the Class will not be harmed. The named Plaintiff is typically situated and has no conflict of interest with the Class as a whole.

E.     **Class Action Maintainable Under Rule 23(b)(2):** By misrepresenting themselves, their conflicts of interest, their lack of legal qualifications, and their general mal-intent to all their clients, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making the claims for monetary, injunctive, and declaratory relief sought herein the appropriate remedies for the Class.

F.     **Class Action Maintainable under Rule 23(b)(3):** A class action is appropriate here because common questions of law and fact predominate over any individual questions affecting only individual members. Class treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated individuals to prosecute their common claims in a single form simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. Without a class action, Defendants will remain free from responsibility for its course of deceptive and misrepresentative conduct and will be allowed to retain the proceeds that it obtained from deceiving Plaintiff and the members of the Class into paying large sums of money for misleading and harmful financial planning advice. Without class treatment, Plaintiff and similar entities will be forced to conduct protracted, piecemeal litigation that might risk establishing conflicting standards of conduct and/or determinations.

G.     **Ascertainability:** The Class Members are ascertainable as all Defendants can identify every single class member from their own records. Accordingly, mere ministerial acts on the part of Defendants and the potential Class Members will be necessary to ascertain all potential Class Members.

111.     In this action, Plaintiff seeks all appropriate and available relief from Defendants for their misrepresentations and deceptive conduct in the course of inducing clients to sign up for their Medicaid planning services.

**COUNT I:  Violation of the New Jersey Consumer Fraud Act ("CFA")**
(against Defendant SPS)

112.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

113.    Plaintiff seeks relief pursuant to the CFA, which enshrines legal protections and legal recourse for private actions brought by New Jersey consumers to obtain relief and recover damages caused by deceptive commercial conduct:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended or supplemented may bring an action . . . in any court of competent jurisdiction.[37]

114.    SPS's actions described above constitute actionable and ongoing violations of the CFA pursuant to N.J. Stat. § 56:8-2 ("Fraud, etc., in connection with sale or advertisement of merchandise or real estate as unlawful practice"), which provides as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, . . . in connection with the sale or advertisement of any merchandise . . ., or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice . . . .[38]

115.    Plaintiff, the Class, Defendants and Defendants' employees, officers, directors, servants, and/or other representatives are all "persons" as defined by the relevant section of the CFA.[39]

116.    SPS's senior planning services are "merchandise" as defined by the relevant section of the CFA, as it was a "service" "offered directly to the public for sale."[40]

---

[37] N.J.S.A. § 56:8-19.

[38] N.J.S.A. § 56:8-2.

[39]   *See, e.g.*, N.J.S.A. § 56:8-1(d) ("[A]ny natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee, or *cestuis que trustent* thereof.").

[40]   *See, e.g.*, N.J.S.A. § 56:8-1(c) ("The term 'merchandise' shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale.").

117.    SPS's actions, misrepresentations, and deceptions described herein constitute a "sale" and/or an "advertisement"[41] as defined by the relevant section of the CFA (*i.e.*, the sale and/or advertisement of SPS's Medicaid planning services).[42]

118.    Defendants' actions constitute a violation of the New Jersey Adult Protective Services Act, N.J.S.A. 52 :27D-406, *et. seq.*, and therefore also constitute a violation of the CFA, inasmuch as the long-term care facilities (as licensed health care professionals) should have had reasonable cause to believe that their patients were the "subject of abuse, neglect or exploitation," and thus were obligated to report the information to the county adult services provider.  N.J.A.A. 52:27D-409a(1).

119.    Similarly, Defendants' actions of freely sharing their patients/clients' personal information amongst each other, with the intention of using that information for their (and not the patients/clients') benefit, which also constitutes a violation of New Jersey common law regarding privacy (which recognizes the tort of intrusion on seclusion[43]), and the New Jersey Constitution,[44] and thus also constitute a violation of the CFA.

120.    SPS's unconscionable affirmative actions, misrepresentations, and/or deceptions attendant to its Medicaid planning services as discussed throughout this Class Action Complaint (*i.e.*, unconscionably and deceptively claiming they are authorized to provide legal advice;

---

[41]  *See, e.g.*, N.J.S.A. § 56:8-1(a) ("[T]he attempt directly or indirectly by publication, dissemination, solicitation, [e]ndorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof . . . .").

[42]  *See, e.g.*, N.J.S.A. § 56:8-1(e) ("[A]ny sale, rental or distribution, offer for sale, rental or distribution, or attempt directly to sell, rent or distribute.").

[43]  *See Bisbee v. John C. Conover Agency*, 186 N.J.Super. 335, 340, 452 A.2d 689 (1982), citing Restatement (Second) of Torts, § 652B (1977) (To be an actionable tort, an invasion of privacy need not be physical; it can also arise "by the use of the defendant's senses… to oversee or overhear the plaintiff's private affairs…." Or "[i]t may be by some other form of investigation or examination into his private concerns…").  For a fuller discussion of this law, *see infra,* Count II.

[44]  N.J.S.A. Const. Art. 1, ¶ 1, stating that "All persons are by nature free and independent and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  *See also Hennessey v. Coastal Eagle Point Oil Co.*, 609 A.2d 11, 18 (N.J. 1992) (stating that New Jersey Supreme Court has "recognized a constitution-based privacy right in many contexts:… [including] disclosure of confidential personal information.").

unconscionably and deceptively claiming they are representing Plaintiff and the Class's best financial interests, when in fact they are operating in the interests of themselves and the long-term care facilities, in the process inducing clients to sign up for their services, while providing either harmful and misleading financial advice or no advice at all; concealing, suppressing, and/or omitting salient material facts from their communications with senior citizen and disabled consumers regarding their conflicting interests with the long-term care facilities; and obtaining the contractual consent of Plaintiff and the Class to the agreements governing their relationship through fraud, and/or deception; and unconsciously and deceptively inducing Plaintiff and the Class to pay money in exchange for no consideration).

121.    Plaintiff and the Class have suffered ascertainable financial injuries and/or damages as a result of SPS's unconscionable affirmative actions and misrepresentations, including, but not limited to, payment of either $5,000 or $6,500 for misleading services; and/or little or no services at all.

**WHEREFORE,** Plaintiff and the Class respectfully requests that this Honorable Court enter judgment against SPS as to Count I and award Plaintiff and the Class actual and statutory damages for each instance of SPS's unfair and/or deceptive conduct, including, but not limited to each instance when SPS and its agents, employees, officers, directors, servants, and/or other representatives represented that they could provide legal advice; did not reveal their conflicts of interest to their clients and acted in the best interest of the long-term care facilities; impersonated attorneys, and gave improper and unauthorized legal advice Plaintiff and the Class respectfully request damages;[45] together with interest, statutory damages, treble damages, costs of litigation,

---

[45] *See*, *e.g.*, N.J.S.A. § 56:8-2.11 ("Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful."); N.J.S.A. § 56:8-2.12 ("The refund of moneys herein provided for may be recovered in a private action . . . ."); N.J.S.A. § 56:8-14.32.a. ("In addition to any other penalty authorized by law, a person who violates the provisions of P.L. 1960, c.39 (C.56:8-1 *et*

reasonable attorneys' fees,[46] injunctive relief, and any other supplemental relief as this Court may deem appropriate.

### COUNT II: Violation of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act (TCCWNA)
(Against Defendant SPS)

122.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

123.    In relevant part, the TCCWNA prohibits an ambit of corporate behavior:

No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed. Consumer means any individual who buys, leases, borrows, or bails any money, property or service which is primarily for personal, family or household purposes.[47]

124.    TCCWNA then provides as follows:

Any person who violates the provisions of this act shall be liable to the aggrieved consumer for a civil penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs.  This may be recoverable by the consumer in a civil action in a court of competent jurisdiction . . . against the seller, lessor, creditor, lender or bailee or assignee of any of the aforesaid, who aggrieved him.  A consumer also shall have the right to petition the court to terminate a contract which violates the provisions of section 2 of this act and the court in its discretion may void the contract.[48]

---

*seq.*) shall be subject to additional penalties as follows: (1) A penalty of not more than $10,000 if the violation caused the victim of the violation pecuniary injury and the person knew or should have known that the victim is a senior citizen or a person with a disability; or (2) A penalty of not more than $30,000 if the violation was part of a scheme, plan, or course of conduct directed at senior citizens or persons with disabilities in connection with sales or advertisements.").

[46] *See, e.g.*, N.J.S.A. § 56:8-19 ("In any action under this section the court shall, in addition to any appropriate legal or equitable relief, award threefold the damages sustained by any person in interest.  In all actions under this section. . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.").

[47] N.J.S.A. § 56:12-15.

[48] N.J.S.A. § 56:12-17.

125.    Plaintiff and the Class are "consumers" as defined by TCCWNA (*i.e.*, "individuals" who have bought, leased, borrowed, and/or bailed property and/or service from Defendants in the form of Medicaid planning/application services, which were primarily for "personal, family, or household purposes").

126.    Defendant SPS is considered a "seller, lessor, creditor, lender, or bailee" under TCCWNA and its misrepresentations, omissions, and/or related actions attendant to its multiple representations, in print or on the internet, constitute an "offer to any consumer or prospective consumer" (*i.e.*, offers to enter into a relationship for Defendant SPS to provide Medicaid planning/application services).

127.    Defendant SPS's misrepresentations, omissions, and/or related actions *also* constitute acts by which these Defendants have given or displayed a written consumer warranty, notice or sign regarding the terms of the at-issue fee agreements.

128.    Defendant SPS's conduct has violated the clearly established rights of Plaintiff and the Class under New Jersey state law by forcing Plaintiff and the Class to agree to unconscionable contract terms in its fee agreements(s) as defined under New Jersey law, including, but not limited to, the waiver of their right to a jury trial. *See ¶* 52, *supra* (detailing SPS's contract terms which state, in relevant part, that "[t]he parties hereto hereby irrevocably waive any right to a trial by jury with respect to any and all disputes and claims hereunder or related hereto.").

129.    New Jersey courts have long upheld that the constitutional right to a jury waiver cannot be made in a contract of adhesion.  "The right to a jury trial ... is far more fundamental than the right to personal service, and cannot be waived absent a showing that its relinquishment is knowing and intentional." *Fairfield Leasing Corp. v. Techni-Graphics, Inc.*, 607 A.2d 703,

704 (N. J. Super. 1992); *see same,* at 705, citing *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937) ("Jury trial may be waived if done knowingly and intentionally, but courts will indulge every reasonable presumption against waiver.").

130.    As a result of Defendants' actions, Plaintiff and the Class have been harmed because they were, and are, *presumably* deprived of their constitutional right to bring this case as a jury trial in New Jersey state or federal courts.

**WHEREFORE**, Plaintiff and the Class respectfully request that this Honorable Court enter judgment against Defendant SPS to Count II and award Plaintiff and the Class actual and statutory damages for each instance of SPS's illegal conduct, including, but not limited to each instance when SPS and its agents and employees subjected the Class to unconscionable contractual terms.   Plaintiffs and the Class respectfully request termination of the at-issue contract(s),[49] actual damages together with interest,[50] statutory damages/civil penalties,[51] costs of litigation,[52] reasonable attorneys' fees,[53] injunctive relief, and any other supplemental relief that this Court may deem appropriate.

## COUNT III: Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.*
### (Against All Defendants)

131.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

---

[49] *See*, *e.g.*, N.J.S.A. § 56:12-17 ("A consumer also shall have the right to petition the court to terminate a contract which violates the provisions of section 2 of this act and the court in its discretion may void the contract.").
[50] *Id.* ("Any person who violates the provisions of this act shall be liable to the aggrieved consumer for a civil penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs.").
[51] *Id.*
[52] *Id*.
[53] *Id*.

132.    This claim is brought by Plaintiff and the Class against each Defendant for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, *et seq*.

133.    At all relevant times, each of the Defendants are and have been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

134.    Similarly, Plaintiff and the members of the Class are each considered a "person," as that term is defined in 18 U.S.C. § 1961(3), and all have standing to sue as they were and are injured in their respective property as a result of the Defendants' wrongful conduct described herein.

135.    At all relevant times, Defendants were together an association-in-fact that constituted and still constitutes an "enterprise" (the "Enterprise") engaged in interstate commerce as that term is defined by 18 U.S.C. § 1961(4) as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

136.    Under Section 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose (hereinafter, the "Enterprise").

137.    The Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for the common purpose of fraudulently marketing and selling their misleading Medicaid planning/application services to elderly United States residents, and reaping enormous profits.

138.    To accomplish this purpose, the Enterprise engaged in a sophisticated, well-developed, and fraudulent marketing and sales scheme designed to sell Medicaid planning/application services to Plaintiff and the Class under the guise of providing allegedly sound financial planning information regarding asset planning and preservation for purposes of obtaining Medicaid benefits (the "scheme").

139.    The Enterprise engaged in, and its activities affected, interstate commerce because it involved commercial activities across state boundaries, including but not limited to: (1) the marketing, promotion, and advertisement of Defendants' financial planning services and/or legal services; and (2) the provision of unsound, and/or unlicensed legal advice, concerning financial planning, asset preservation and obtaining of Medicaid benefits.

140.    Each of Defendants participated in the operation and management of the Enterprise by directing its affairs as described herein.

141.    The Enterprise created by Defendants was and is separate from each of them, but successfully operates through the performance by each individual and/or entity of their designated role, including:

   a.   SPS and LTC perform the marketing and sale activities that "roped" Plaintiff and the Class into purchasing SPS's Medicaid planning/application services including through internet, print and radio advertisements, as well as through in-person informational meetings;

   b.   SPS and LTC also market their services through the long-term care facilities: SPS helps place individuals at the facilities, and then the facilities include SPS referral forms in every admission packet, and use the utilization review meetings as sales meetings for their services;

   c.   Upon information and belief, LTC also provides certain health-protected information to SPS, who then contacts and markets to those individuals its asset planning services, violating the privacy of those individuals;

   d.   SPS operates under the guise of providing legal and financial advice regarding asset planning and obtaining of Medicaid benefits,

e.  SPS operates under the guise of providing these services, while, unknown to the elderly clients, SPS and LTC were and are working as sales agents for the benefit of themselves and/or the long-term care facilities, rather than for the benefit of their individual clients;

f.  Price & Price was hired by SPS only to lend legitimacy to the operation by performing the "legal portion" of the financial services, following the New Jersey Supreme Court's Committee on the Unauthorized Practice of Law 2016 holding that non-lawyers and companies providing such services are engaging in the unauthorized practice of law; in reality, Price & Price, in concert with SPS, induces clients to sign up for services under the assumption that they (Price & Price) will provide this legal service, but in reality they not provide any service of any legitimate value to the clients.

142.  Were it not for the presence, operation, and efforts of each of these distinct parts of the Enterprise, none would be individually sufficient to consummate the sale of these unsuitable Medicaid planning/application services to Plaintiff and the Class, as:

a.  Were it not for the combined marketing and sales efforts of SPS and LTC and its employees, agents, and corporate officers, both utilizing their long-term care facilities' client base, it would not be possible to sell SPS's Medicaid planning/application services to Plaintiff and the Class;

b.  Were it not for SPS's involvement of Price & Price, SPS would be unable to peddle its services in a seemingly "legitimate" manner in the State of New Jersey;

c.  Were it not for LTC's illegal referrals from the long-term care facilities, SPS would not have received additional names of its potential clients, to whom it planned to market and sell its Medicaid planning/application services;

d.  Were it not for the issuance of the unsuitable legal and financial advice sanctioned by SPS and Price & Price to Plaintiff and the Class (and, thereby, the payment of lucrative fees to SPS and its employees, agents, and corporate officers) there would be insufficient profit to enable the peddling of these unsuitable Medicaid planning/application services to Plaintiff and the Class.

143.  Throughout the relevant time period and continuing through into the present, Defendants were individually and collectively aware of the other members of the Enterprise and their respective actions in furtherance of the Enterprise's overall scheme: namely, inducing

Plaintiff and the Class to purchase Medicaid planning/application services under the auspices that they were legally authorized to provide such services.

144.    Defendants each participated, directly and/or indirectly, in the conduct of the affairs of the Enterprise through a "pattern of racketeering activity" as that term is defined at 18 U.S.C. § 1961(5) and "racketeering activity" as that term is defined at 18 U.S.C. § 1961(1), including committing, aiding and abetting, and/or conspiring to commit at least two of these predicate offenses within the last ten years:

    a.  Mail Fraud, in violation of 18 U.S.C. § 1341; and/or

    b.  Wire Fraud, in violation of 18 U.S.C. § 1343.

145.    Upon information and belief, the relevant mail and wire communications by which Defendants perpetuated their fraudulent Enterprise included, without limitation, the following:

    a.  Letters, advertisements, radio broadcasts, and/or mailings sent via the U.S. Postal Service ("USPS") and/or any other "private or commercial interstate carrier" from Defendants to Plaintiff and the Class (*See* Exhibit M, N, DD, and radio and internet broadcasts as detailed, *supra*, ¶¶ 60, 84, and 86);

    b.  Letters, advertisements, radio broadcasts, and/or mailings sent via the USPS and/or any other "private or commercial interstate carrier" to the agents, attorneys, advisors, and/or accountants of Plaintiff and the Class (*See* Exhibit DD, and radio and internet broadcasts as detailed, *supra*, ¶¶ 60, 84, and 86);

    c.  Letters, advertisements, radio broadcasts, and/or mailings sent via the USPS and/or any other "private or commercial interstate carrier" amongst/between Defendants (*See* Exhibit DD, as evidence of Spend-Down Analysis letter sent from Price & Price to Ms. Cotton, "c/o SPS");

    d.  Interstate telephone communications between Plaintiff, the Class, and Defendants (including, but not limited to, communications effectuated through SPS's intake line) (*See* Exhibit X);

    e.  Interstate telephone communications amongst/between Defendants;

    f.   Electronic communications (*e.g.*, e-mail) over the Internet between Plaintiff, the Class, and Defendants) (*See* Exhibits T, X, Y, BB, CC); and

    g.   Electronic communications (*e.g.*, e-mail) over the Internet between/amongst Defendants (*See* Exhibit GG).

146.    Upon information and belief, there has been (and is) regular communications between each of Defendants and amongst Plaintiff, the Class, and Defendants, which occurred, and continues to occur, through the use of the wires and the mail.

147.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  To the extent possible, Plaintiff and the Class have described the types of predicate acts of mail and/or wire fraud by which Defendants engaged in fraudulent activity in furtherance of the scheme.

148.    The members of the Enterprise (*i.e.*, Defendants) directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff and the Class cannot fully know at present, because such information lies in the Defendants' (and others') possession.

149.    In undertaking these above-described wrongful courses of conduct, Defendants have violated 18 U.S.C. §§ 1962(b)-(d) of RICO.

150.    Section 1962(b) makes it "unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

151.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c).

152.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

153.    In relevant part, each of Defendants respectively conducted the affairs of the Enterprise through a pattern of racketeering activity by either directly engaging in these activities or conspiring to do so, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

154.    Overall, Defendants' acts and/or omissions constitute a pattern of racketeering activity that is related in purpose (*i.e.*, to provide and/or sell illegal Medicaid planning/application services, or no services at all, and to profit from such fraudulent sales and advice), which has continued unabated for the relevant time period, victimizing potentially thousands of senior citizens, and threatens to continue in perpetuity without proper intervention.

155.    By reason of, and as a result of the conduct of Defendants in perpetuating the Enterprise and, in particular, its pattern of racketeering activity, Plaintiff and the Class have been injured in their business and/or property pursuant to 18 U.S.C. § 1964(c), and are therefore entitled to recover treble damages, attorneys' fees and appropriate equitable relief.

**WHEREFORE,** Plaintiff and the Class respectfully requests that this Honorable Court enter judgment for them and against Defendants, for direct and consequential damages related to their contractual relationship for financial services with Defendants, in amounts to be determined by the Court, together with interest, costs of litigation, attorneys' fees, and all other such relief as this Court may deem just and proper.

<u>**COUNT IV: Violations of NJ Privacy Law**</u>
(against Defendants SPS and LTC)

156.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

157.    In 1996, the United States Congress enacted the Health Insurance Portability and Accountability Act[54] ("HIPAA" or "the Act"). One of the primary purposes of the Act was to protect the security and privacy of individually identifiable health information.

158.    The regulations promulgating these standards as created by the U.S. Department of Health and Human Services became effective on April 14, 2003, and are collectively known as "the Privacy Rule," which sets forth standards and procedures for the collection and disclosure of "protected health information" ("PHI").[55]  The Privacy Rule establishes patients' rights and requires that health professionals implement various procedures regarding the use of and access to health care information.  It prohibits "covered entities" from using and disclosing PHI except as required or permitted by the regulations. 45 *C.F.R.* § 164.501 and 45 *C.F.R.* § 160.103. There are three categories of "covered entities": (1) health plans; (2) health care clearinghouses; and (3) health care providers. 45 *C.F.R.* § 160.103.[56]

159.    The Privacy Rule prohibits covered entities from using or disclosing PHI in any form oral, written or electronic, except as permitted under the Privacy Rule. 45 C.F.R. § 164.502(a). "Use" and "disclosure" are defined very broadly. 45 C.F.R. § 164.501. "Use" includes an examination of PHI; "disclosure" includes divulging or providing access to PHI.

---

[54] 42 U.S.C. § 1320(d), *et seq.*

[55] PHI includes "any information, whether oral or recorded in any form or medium, that: (1) is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and (2) relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103.

[56] "Health care provider" means a "provider of services" (as defined in 42 U.S.C.A. 1395x(u)), a provider of "medical and other health services" (as defined in 42 U.S.C.A. 1395x(s)), and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business. 45 C.F.R. § 160.103.

160.    Here, SPS and LTC are both a "covered entity" under the Privacy Rule, as it is an organization that bills, or is paid for, health care in the normal course of business. 45 C.F.R. § 160.103.

161.    There are no circumstances envisioned by the Code of Federal Regulations that might <u>potentially</u> allow LTC (absent patient consent) to search the patients of the long-term care facilities, and then analyze those patients' financial information and thereafter provide those names and/or any other identifying information to SPS, or anyone else.

162.    Pursuant to 45 C.F.R. 164.508, a covered entity <u>must</u> obtain an authorization for any use or disclosure of protected health information for marketing purposes, except in specific situations not applicable here.   The fact that SPS's patient-clients may have signed an authorization as part of their Fee Agreement, such an authorization does not comply with the required HIPAA notifications.   Furthermore, because said non-compliant HIPAA authorizations were executed only <u>AFTER</u> LTC provided SPS with PHI of a particular person or persons for marketing purposes, would not retroactively insulate either party from any potential liability.

163.    Although there is no private right of action under HIPAA, New Jersey permits a plaintiff to plead a HIPAA violation under a common-law invasion of privacy claim.  *See Smith v. Datla*, 164 A.3d 1110 (N. J. Super. 2017) (holding that patient plaintiff's claim against doctor for invasion of privacy, based on doctor's disclosure of patient's HIV-positive status to third party, could be brought as common-law invasion of privacy claim).

164.    New Jersey common law recognizes the tort of intrusion on seclusion: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the

intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts, § 652B (1977).

165.    To be an actionable tort, an invasion of privacy need not be physical; it can also arise "by the use of the defendant's senses… to oversee or overhear the plaintiff's private affairs…." Or "[i]t may be by some other form of investigation or examination into his private concerns…." *Id.* at cmt. b. To recover under this cause of action the plaintiff need not prove publication of any information. *Id*. In discussing section 652B, the Appellate Division declared, "The thrust of this aspect of the tort is… that a person's private, personal affairs should not be pried into." *Bisbee v. John C. Conover Agency*, 186 N.J.Super. 335, 340, 452 A.2d 689 (1982); cited in *Hennessey v. Coastal Eagle Point Oil Co.*, 609 A.2d 11, 17 (N.J. 1992).

166.    Here, Defendant LTC provides billing and administration services for nursing homes. Thus, LTC had and continues to have access to the patients' financial and medical records residing at that facility.

167.    Upon information and belief, LTC reviewed and analyzed these patient records, and then either shared that patient information with its long-term care facility clients, or its "affiliate"/co-conspirator, SPS, a non-covered entity, to use in conjunction with the marketing of its Medicaid planning/application services.

168.    LTC and SPS's actions exposed Plaintiff's and the Class's highly sensitive medical and financial information to a non-privileged third-party, SPS, an act that would be objectively offensive to any reasonable person, even if that person was not an ailing senior citizen.

169.    LTC's and SPS's actions thus violated Plaintiff's right to privacy of his personal financial and, potential, medical information under New Jersey law.

**WHEREFORE**, Plaintiff and the Class respectfully requests that this Honorable Court enter judgment for them and against Defendants, for direct and consequential damages related to their purchases of financial services through/from Defendants, in amounts to be determined by the Court, together with interest, costs of litigation, attorneys' fees, and all other such relief as this Court may deem just and proper.

## COUNT V: Unjust Enrichment/Restitution
(against Defendants SPS and Price & Price)

170.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

171.    Defendants, through their wrongful conduct described above, have reaped unjust profits from its continued actions.  SPS's and Price & Price's profits would have been reduced but for this conduct.

172.    Accordingly, Defendants have been unjustly enriched by their above-described conduct and not be permitted to retain:

1. (for SPS): any of the benefit of the fraudulent and misleading fee agreements paid by Plaintiff and the Class.

2. (for Price & Price): any of the benefit of their own fraudulent and misleading fee agreement, or any additional payment received on account of further business.

173.    Defendants, therefore, must disgorge their unjustly acquired profits and other monetary benefits resulting from its unlawful conduct and provide restitution to Plaintiff and the Class.

**WHEREFORE**, Plaintiff and the Class respectfully request that this Honorable Court enter judgment against Defendants on Count V, award Plaintiff and the Class all actual damages related to the unlawful and inequitable payments collected by Defendants, and such other relief as the Court deems appropriate.

## COUNT VI: Breach of Fiduciary Duty
### (against Defendant SPS)

174.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

175.    Under New Jersey law, the essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. *McKelvey v. Pierce*, 800 A.2d 840, 859–60 (N.J. 2002), citing *F.G. v. MacDonell*, 696 A.2d 697, 703-704 (N.J. 1997). A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. *Id.*, citing *Restatement (Second) of Torts* § 874 cmt. a (1979) (and collecting cases). The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care. *Id.*, citing *Restatement (Second) of Trusts* §§ 170, 174 (1959). Accordingly, the fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship. *Id.,* citing *Restatement (Second) of Torts* § 874 (1979).

176.    SPS's form Fee Agreement states that their purpose is to serve "as the representative of the Applicant to guide, assist, oversee, file the application and to perform related follow-up activities associated with the Medicaid application process…". Section 2 of the Fee Agreement ("Releases"), also requires each potential client to sign an "Authorization for Release of Information," allowing SPS to communicate with, provide information to, and obtain information from state and county Medicaid caseworkers and other financial services providers (i.e., banks, insurance companies, etc.) for the purpose of determining the eligibility status and obtaining Medicaid benefits for the Applicant."

177.    Thus, just as it represents in its form contract, SPS assumed a fiduciary duty to, its principals (the elderly clients-in-fact).  SPS was not permitted to serve any private interest of their own, adverse to the interest of the principal, without the principal's consent.

178.    Here, however, Plaintiff and the Class were never made aware that SPS's actual duty was both to LTC and the long-term care facilities, rather than to its elderly clients.  SPS breached its fiduciary duty to Plaintiff and the Class by acting in the best interest of themselves and LTC, rather than to their clients.

179.    Plaintiff and the Class have suffered harm as a proximate result of Defendants' violations of law and wrongful conduct.

**WHEREFORE**, Plaintiff and the Class respectfully request that this Honorable Court enter judgment against SPS on Count VI, award Plaintiff and the Class all actual damages related to the unlawful and inequitable payments collected by Defendant, together with punitive damages and such further relief as allowed by the Court.

### COUNT VII: Breach of the Implied Covenant of Good Faith and Fair Dealing
(against Defendants SPS and Price & Price)

180.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

181.    This is an action for breach of the implied covenant of good faith and fair dealing against Defendants SPS and Price & Price.

182.    Plaintiff and members of the Class, were parties to separate fee agreements between themselves and Defendants SPS and Price & Price.  *See* Exhibits B and W.

183.    All contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit, not merely the letter, of the

bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contracts, in addition to their form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

184.    Subterfuge and evasion violate the obligation of good faith in performance.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

185.    Defendant SPS has breached its obligation of good faith and fair dealing because it never intended to act in the best interests of its clients.  Simply put, SPS breached the covenant of good faith and fair dealing through the policies and practices alleged in this action.

186.    Defendant Price & Price also breached its obligation of good faith and fair dealing because it (i) never appeared at any client meeting to introduce or explain its fee agreement or services; (ii) never engaged in any actual or meaningful analysis of Plaintiff's or the Class's assets to assist with long-term planning; and (iii) followed up its "analysis" with a proposition to engage Price & Price for the implementation of another long-term strategy for an additional fee of $6,000.

187.    As a direct and proximate result of these Defendants' actions, Plaintiff and the members of the Class have suffered and will continue to suffer damages, including those described above.

188.    Plaintiff and the Class have performed all, or substantially all, of the material obligations imposed on them under the contract.

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, demands judgment against Defendant SPS and Price & Price for damages, interest, costs, and attorneys' fees to the extent permitted by law, as well as such additional relief as is necessary to protect Plaintiff's rights and interests.

**COUNT VIII: Declaratory Relief**
(against All Defendants)

189.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

190.    Defendants' unconscionable affirmative actions, misrepresentations, and/or deceptions attendant to its Medicaid planning services as discussed throughout this Class Action Complaint (*i.e.*, unconscionably and deceptively claiming they are authorized to provide legal services; unconscionably and deceptively claiming they are representing Plaintiff and the Class's best financial interests, when in fact they are operating in the interests of themselves and the long-term care facilities, in the process inducing clients to sign up for their services, while providing either harmful and misleading financial and/or legal advice or no advice at all; concealing, suppressing, and/or omitting salient material facts from their communications with New Jersey senior citizen and disabled consumers regarding their conflicting interests with the long-term care facilities; engaging in illicit fee-splitting with law firms; and obtaining the contractual consent of Plaintiff and the Class to the agreements governing their relationship through fraud, and/or deception).

191.    Pursuant to 28 U.S.C. § 2201. Creation of remedy:

> In a case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

57

192.    Plaintiff and the Class are interested and affected by the Defendants' continued fraudulent acts.

193.    Declaratory relief is appropriate because: (1) there is a real, actual, and substantial controversy in which claims have been asserted against Defendants SPS, LTC, and Price & Price, which have a vested interest in contesting those claims; (2) the instant controversy is between parties who are adverse and antagonistic; (3) Plaintiff and the Class have a direct, substantial, and present interest in resolution of the instant controversy; and (4) the controversy is ripe for judicial determination and adjudication, and thus Plaintiff and the Class seek a binding decree as the impropriety of Defendants' conduct.

194.    Plaintiff and the Class thus seek a declaration that Defendants have violated New Jersey and federal law, including, but not limited to, RICO, the CFA, TCCWNA and New Jersey privacy law, by enticing and inducing clients to pay for services they do not need and/or for not providing any services in return for payment, and by deceiving clients into believing they are abiding by the Supreme Court of New Jersey's directives on engaging in the unauthorized practice of law.

**WHEREFORE,** Plaintiff and the Class respectfully request that this Honorable Court enter judgment against Defendant on Count VIII and award declaratory relief enjoining Defendants from pursuing the policies, acts, and practices complained of herein, as well as any further relief (pursuant to 28 U.S.C. § 2202) and any other relief that this Honorable Court may deem appropriate.

## COUNT IX: VOID CONTRACT
(against Defendants SPS and Price & Price)

58

195.    Plaintiff incorporates herein, by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth herein at length.

196.    Defendants SPS's Fee Agreement state that the clients must pay $6,500 to itself and Price and Price, *regardless* of whether SPS performs the "purpose" of the Agreement, that is, of assisting the Applicant in filing the Medicaid application and performing follow-up activities related to the Medicaid application process as is necessary for obtaining a Medicaid eligibility determination.

197.    SPS's assurances, both in its advertising and in person, that it was an "industry leader" and an expert in securing Medicaid, induced clients into believing that they would be Medicaid eligible in return for payment to SPS.

198.    In sum, SPS's (and by extension, Price & Price's) Fee Agreement fraudulently induced Plaintiff, and the Class, into paying $6,500 in return for their not having to provide any services.

199.    As stated in *Geisinger Clinic v. Di Cuccio, M.D.*, 606 A.2d 509, 512 (Pa. Super. 1992): "A promise to perform or to forebear from performing must be supported by consideration.  If the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable.  The promisor has committed him/herself to nothing."

200.    Here, because SPS has essentially committed itself to doing "nothing," the contract is illusory, lacking consideration and unenforceable.

201.    Plaintiff and the Class seek to rescind the SPS and, by extension, the Price & Price Fee Agreements on the ground that the contracts are void and unenforceable for lack of consideration.

202.    Plaintiff and the Class seeks to recover all fees and charges received by the SPS and Price & Price Defendants pursuant to the disaffirmed and voided contracts.

**WHEREFORE,** Plaintiff and the Class respectfully request that this Honorable Court enter judgment against Defendant SPS and Price & Price LLC on Count IX and enter an order declaring that contracts entered into between Plaintiff and SPS and Price & Price LLC are rescinded together with actual damages, cost and expenses, and any other relief that this Honorable Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

DATED: MARCH 25, 2019                ANAPOL WEISS

BY: _____

DAVID S. SENOFF, ESQUIRE
HILLARY B. WEINSTEIN, ESQUIRE
1040 KINGS HIGHWAY NORTH
SUITE 304
CHERRY HILL, NJ 08034
DSENOFF@ANAPOLWEISS.COM
HWEINSTEIN@ANAPOLWEISS.COM
PHONE: (866) 735-2792
FAX: (215) 875-7733


MARCUS & AUERBACH, LLC
JEROME M. MARCUS, ESQUIRE*
JONATHAN AUERBACH, ESQUIRE*
1121 N. BETHLEHEM PIKE, SUITE 60-242
SPRING HOUSE, PA 19477
(215) 885-2250
AUERBACH@MARCUSAUERBACH.COM
JMARCUS@MARCUSAUERBACH.COM

*PRO HAC ADMISSION TO BE SOUGHT

ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS

60