**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ———————————————— : | |
| THE ESTATE OF LESTER COTTON, *et al.* : | |
| : | Civil Action No.: 19-8921 (FLW) |
| Plaintiffs, : | |
| : | **OPINION** |
| vs. : | |
| : | |
| SENIOR PLANNING SERVICES, LLC and : | |
| PRICE & PRICE LLC, : | |
| : | |
| Defendants. : | |
| ———————————————— : | |

<u>**WOLFSON, Chief Judge**</u>:

Presently before the Court are motions by defendants Senior Planning Services, LLC ("SPS" or the "Company") and Price & Price, LLC ("Price") (collectively, "Defendants") to dismiss this putative class action filed by plaintiffs the Estate of Lester Cotton and Jennifer Cotton (the "Cotton Plaintiffs"), and the Estate of Raymond J. Wojna, Sr., Raymond J. Wojna, Jr., David Wojna, and Helen B. Wojna (the "Wojna Plaintiffs") (Wojna Plaintiffs and Cotton Plaintiffs collectively, "Plaintiffs").   In this matter, Plaintiffs, former clients of SPS, assert claims of consumer fraud and breach of fiduciary duty, against SPS alleging, *inter alia*, that the Company provided illegal Medicaid application assistance services to Plaintiffs.  Furthermore, Plaintiffs allege that those services constitute the unauthorized practice of law and that SPS partnered with Price, a law firm, in order to camouflage SPS's provision of illicit legal advice.  Plaintiffs assert breach of the implied of good faith and fair dealing, and unjust enrichment claims against both Defendants.  Defendants have separately moved to dismiss Plaintiffs' Complaint for failure to state

a claim, and to strike Plaintiffs' class action allegations and other purportedly immaterial and prejudicial information from the Complaint.

For the reasons set forth below, SPS's motion is **GRANTED IN PART AND DENIED IN PART and Price's Motion is DENIED.**  SPS's motion to dismiss is granted with respect to Plaintiffs' New Jersey Consumer Fraud Act ("NJCFA") claim and Plaintiffs are granted leave to file an amended complaint as to the Cotton Plaintiffs and putative Class A member's NJCFA claim within 45 days.  Further, because this Court's exercise of jurisdiction, pursuant to the Class Action Fairness Act ("CAFA") is largely premised on Plaintiffs' NJCFA claim, as explained *infra*, the Court does not address the merits of Plaintiffs' unjust enrichment, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing claims; Defendants' motions are both denied without prejudice with respect to those claims.  If Plaintiffs file an amended complaint, Defendants may file renewed motions to dismiss those claims, if appropriate.  Defendants' motions to strike Plaintiffs' class action allegations and to strike certain factual allegations from the Second Amended Complaint ("SAC") are also denied without prejudice.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following allegations are taken from the SAC and assumed true for purposes of this motion.

### A.     SPS's Business Model

SPS is a New Jersey company that provides assistance to applicants applying for Medicaid. SAC ¶¶2, 36.  In exchange for a fee, SPS handles the Medicaid application process for its clients, including completing the application and representing clients at the Medicaid office.  *See* SAC Ex. D, SPS website "New Jersey Medicaid Planning and Eligibility"; Ex. G, SPS website "Connecticut

Medicaid Planning and Eligibility." SPS provides services in New Jersey, Connecticut, New York, Pennsylvania, Rhode Island and Massachusetts. SAC ¶36.

Medicaid is a federal benefit program that provides health insurance, including paying for hospital services, doctor visits, prescriptions, and nursing home care, to eligible beneficiaries. In order to receive Medicaid, an individual must also meet financial eligibility factors determined by his or her particular state. *Id*. at ¶44. For instance, "to qualify for institutional care in most states, an individual may not have assets exceeding a total of $2,000, and thus, to qualify for Medicaid, an individual would need to spend-down (or otherwise have properly invested or disposed of) nearly all of [his or her] assets." *Id*. According to Plaintiffs, prior to 2016, SPS marketed itself on its website, print and internet ads, and interviews, as qualified to assist families with the "spend-down procedure" in order to meet Medicaid's qualification requirements. *Id*. at ¶¶60-62. For example, SPS's Facebook ads in 2014 and 2015, purportedly described the company as the "Industry Leaders in Optimizing Medicaid Eligibility for Seniors," and the Company's Facebook posts provided hypothetical examples of how to analyze Medicaid spend-down issues. *See id*. at ¶60; *see also* SAC, Ex. R, Feb. 14, 2015 Facebook Post; Ex. S., July 16, 2014, Facebook Post.

Non-party LTC Consulting Services, LLC ("LTC"), a New Jersey company, is an affiliate of SPS, which provides finance, billing, and business management services to long-term care facilities. SAC at ¶¶53-55. Plaintiffs allege that SPS leverages its relationship with LTC to market its services directly to long-term care facilities. *Id*. at ¶¶56-58; 91-107. In Plaintiffs' view, "SPS's true clients are actually the long-term care facilities," which benefit from the company's services because "with SPS's assistance, the facilities [are] less likely to experience any gap in payments between when a private payor's funds run out and Medicaid kicks in." *Id*. at ¶91. As such,

Plaintiffs allege that the relationships between SPS and the long term care facilities poses a conflict of interest for SPS's elderly clients.  *Id*. at ¶¶91-107.

## B.    The New Jersey Committee on the Unauthorized Practice of Law's May 2016 Opinion

In May 2016, the New Jersey Committee on the Unauthorized Practice of Law (the "Committee" [1]) issued an advisory opinion (the "May 2016 Opinion"), advising "that non-lawyers and companies that are not law firms who receive payment or compensation for their services, and/or provide advice regarding Medicaid eligibility, are practicing law."  *Id*. at ¶67; *see also* SAC, Ex., May 2016 Opinion.  The Committee explained that, under the federal regulations governing Medicaid, states must "must allow individual(s) of the applicant or beneficiary's choice to assist in the application process or during a renewal of eligibility."  May 2016 Opinion at 2 (quoting 42 C.F.R. §435.908(b)).  Consistent with that directive, federal regulations permit states to certify staff and volunteers to assist applicants by

> providing information on insurance affordability programs and coverage options, helping individuals complete an application or renewal, working with the individual to provide required documentation, submitting applications and renewals to the agency, interacting with the agency on the status of such applications and renewals, assisting individuals with responding to any requests from the agency, and managing their case between the eligibility determination and regularly scheduled renewals.

*Id*. at 3 (quoting 42 C.F.R. §435.908 (c)(2)).  The certified assistors "may not receive payment or compensation for their services."  *Id*. (citing 42 C.F.R. §435.908 (c)(4)).  The Committee "acknowledge[d] that the federal program requires [s]tates to permit nonlawyers to assist

---

[1]    The Committee is appointed by the Supreme Court of New Jersey and consists of 21 attorneys and four lay members. N.J. Ct. Rule 1:22-1(a). Upon "request of any person, or in connection with the consideration of any complaint or any investigation made on its own initiative, the committee may render advisory opinions relating to the unauthorized practice of law and arrange for their publication." N.J. Ct. Rule 1:22-2(a).

applicants and beneficiaries with Medicaid applications and represent persons in hearings." *Id*. Nonetheless, the Committee held, consistent with similar decisions in Ohio, Florida, and Tennessee that, although non-lawyer Medicaid advisors may provide "limited services" :

> it is the unauthorized practice of law when non-lawyers provide advice in matters that require the professional judgment of a lawyer. Hence, only a lawyer may provide legal advice on issues such as strategies for Medicaid eligibility, including provisions of wills and powers of attorney; on the need for guardianships and the authority to transfer assets; on nursing home laws; on transfers of property; on the impact of marriage and divorce; and on estate administration and the elective share.

*Id*. at 3. The Committee further explained that a non-lawyer Medicaid advisor may provide information on insurance programs, coverage options, and assist filing or renewing a Medicaid application in limited ways, such as by calculating income or assets, but warned that such an advisor "may not provide legal advice on strategies to become eligible for Medicaid benefits, including advice on spending down resources, tax implications, guardianships, sale or transfer of assets, creation of trust or service contracts, and the like." *Id*. at 5. The Committee further noted that the unauthorized practice of law "is not only a criminal offense, N.J.S.A. 2C:21-22," but also suggested that such conduct "may violate the Consumer Fraud Act." *Id*. at 2.

Plaintiffs assert that the services which SPS provided prior to and following the May 2016 Decision, would clearly constitute the unauthorized practice of law under the Committee's decision.[2] SAC at ¶59.

### C.    SPS Relationship with Price

---

[2]    Plaintiffs also allege that, like in New Jersey, the services SPS provides would constitute the unauthorized practice of law and be prohibited in the other states in which SPS operates. *See* SAC ¶¶71-75.

Plaintiffs allege that following the May 2016 Decision, SPS revised its marketing materials on its New Jersey webpage[3] to remove language which could be construed as providing legal advice.  SAC ¶5.  Specifically, SPS purportedly removed statements which promised that the Company would "[g]uide families through the spend-down process."  *Id*.  At that time, SPS also entered into a relationship with Price, a New Jersey elder care law firm, to provide legal services related to the Medicaid application process for its New Jersey clients.  *Id*.; *see also* SAC Ex. B, SPS Post-2016 Fee Agreement Packet.  In that regard, the Fee Agreement between SPS and its clients provides that "Applicant acknowledges and agrees that Senior Planning Services does not provide any legal service or advise and Applicant is not relying on Senior Planning Services to furnish any legal services or advice."  Ex. B ¶8.[4]  Rather, according to the SPS Fee Agreement, New Jersey clients who contract with SPS also agree to pay a fee "to Price & Price, LLC for providing legal services in connection with the Medicaid application."  *Id*. at ¶76; *see also* Ex. B.  The SPS Fee Agreement for its New Jersey clients further provides that "Payment should be made payable to Senior Planning Services and Senior Planning Services will forward payment to Price & Price LLC on [the client's] behalf." *Id*.; *see also* Ex. B ¶4.  New Jersey clients also enter into a separate "Agreement to Provide Legal Services" with Price (the "Retainer").  *Id*. at 7¶6; *see also* Ex. B. at p. 4.  The Retainer describes the nature of the legal representation as "Preparation of Spend Down Strategy" and lists the "Services to be Provided" as follows:

---

[3]   Plaintiffs allege that SPS only modified its New Jersey webpage, and not the webpage for the other states (New York, Pennsylvania, Connecticut, Rhode Island, and Massachusetts) in which it operates.  SAC ¶¶2,10, 36.

[4]   Exhibit B is the Fee Agreement and retainer signed by Jennifer Cotton. The printed portions of the Fee Agreement signed by the Wojnas are nearly identical, with the exception of the additional language in Paragraph 4 of the Cotton's Fee Agreement which provides for the fee to Price & Price.  *See* SAC, Ex. U, Wojna SPS Fee Agreement.

- Review of applicant's financial records which have been made available by client including:
  - Review of relevant facts as provided by client; [e]valuation of applicant's income;
  - Need for Qualified Income Trust (services do not include preparation of the trust);
  - Evaluation of applicant's assets;
  - Evaluation of applicant's monthly cost of care;
  - For a couple, evaluation of community spouse resource allowance;
  - Comment on whether or not Long-Term Care Planning is appropriate.
- Preparation of report which provides a spend down strategy for Medicaid qualifying purposes. A copy of the report will be provided to the client. We also provide a copy of the report to Senior Planning Services to facilitate their completion of the applicant's Medicaid application.

*Id*. Despite this description of Price's role in its retention letter, Plaintiffs allege that SPS's relationship with Price "was simply a veneer signed to obscure SPS's actions" and Price merely "plac[ed] its legal imprimatur on SPS's provision of exactly the same advice SPS had been providing before the issuance of the May 2016 Decision." *Id*. at ¶6. Plaintiffs further allege that SPS did not implement any meaningful changes to its business model, and highlights examples of purported legal advice on the Company's New Jersey webpage. *Id*. at ¶78. For example, SPS's website allegedly represents that 1) the Company will "assist families in utilizing excludable resources" and "assist clients in the process of liquidating life insurance policies, annuities and stocks etc"; 2) "sets out a lengthy explanation of a New Jersey Qualified Trust and then specifically instructs readers not to hire a lawyer to obtain advice on this topic but instead to hire SPS"; 3) provides a "definition of a Power of Attorney and creation of a guardianship relationship, and again directs prospective clients to SPS for preparation of a legal instrument creating that relationship." *Id*. In addition to the statements on SPS's website, Plaintiffs allege that SPS continues to publicly hold itself out as able to advise on legal issues related to the Medicaid application process. *Id*. For example, in an April 2017 interview, SPS executives allegedly

7

"explained in depth how SPS could assist individuals with complex financial vehicles such as a promissory note, or spousal refusal, in order to retain assets and continue to qualify for Medicaid," and SPS has allegedly "never taken down Youtube materials it put up [prior to the Committee's May 2016 Opinion] which describe its activities in ways that were clearly barred by the May 2016 Decision." *Id.*

Thus, Plaintiffs assert that SPS is merely using its relationship with Price to obscure the fact that SPS is engaging in the unauthorized practice of law. *Id.* at ¶¶6-7, 80.

### D.    The Named Plaintiffs' Involvement with SPS

#### 1.    The Cottons

Lester Cotton, a former New Jersey resident who is now deceased, was admitted to Cinnaminson Center, a Genesis ("Genesis") HealthCare facility in Cinnaminson, New Jersey, for rehabilitation services in early March 2018. *Id.* at ¶108. Mr. Cotton was initially paying for his stay through private insurance; however, in April 2018, it allegedly became apparent that Mr. Cotton would need long term care. *Id.* at ¶109. At that time, Genesis contacted Mr. Cotton's daughter, Jennifer Cotton, who held his power of attorney, and allegedly insisted that Ms. Cotton meet with an SPS representative so that SPS could "assist" her father with becoming Medicaid-eligible. *Id.* at ¶110. On April 26, 2018, Ms. Cotton, without her father, attended what she thought was an informational meeting with an SPS agent, Michael Steinberg. *Id.* at ¶111. At that meeting, Mr. Steinberg informed Ms. Cotton that SPS would assist her father with obtaining Medicaid, but allegedly failed to explain any of the  particulars regarding the Medicaid application process, and merely asked that Ms. Cotton sign certain documents to engage SPS's services. *Id.* According to Plaintiffs, Mr. Steinberg never mentioned the possibility that Mr. Cotton "might not qualify for Medicaid; nor that as part of the services, she was hiring an attorney; nor that Ms. Cotton had

signed a limited durable power of attorney." *Id*.  Although she was professedly uncomfortable with the arrangement, Ms. Cotton agreed to hire SPS and executed the relevant forms.  *Id*.  The signed Fee Agreement specifies that Ms. Cotton, on Mr. Cotton's behalf, agreed to pay "$6,175 to Senior Planning Services for its assistance with preparation of the Medicaid application."  Ex. B. ¶ 4.  It also states that the Cottons agreed to pay "$325 to Price & Price, LLC for providing legal services in connection with the Medicaid application as specified in a separate agreement."  *Id*. Afterwards, Ms. Cotton and Mr. Steinberg visited Mr. Cotton in his room to determine the amount of his assets and contacted his financial institutions to verify his financial information.  SAC ¶112.

The next day, April 27, 2018,  Ms. Cotton visited the personnel at the Cinnaminson Center to discuss SPS's services and to express that she was uncomfortable with what had transpired at the SPS meeting.  *Id*. at ¶114. The manager, however, apparently assured Ms. Cotton that SPS could be trusted, and that Genesis worked with SPS all the time.  *Id*.  At that point, Ms. Cotton had not paid SPS's $6,500 fee, although Mr. Steinburg requested Mr. Cotton's bank account information in order to process the payment.  *Id*. at ¶115.  Ms. Cotton avers that she never provided Mr. Steinburg with any of her father's bank account information, "yet on May 9, 2018, Mr. Steinberg, on behalf of SPS, debited [Mr. Cotton's] bank account in the amount of $6,500."  *Id*.

On May 23, 2018, Ms. Cotton received an email from a case manager at SPS conveying a spend-down analysis purportedly drafted by Price, the law firm.  *Id*. at ¶116; *see also* SAC, Ex. GG, May 23, 2018 Email from Hannah Gruen.  Ms. Cotton allegedly "was never contacted by the attorney who wrote the report or any other representative of Price & Price, was never asked to provide anyone at that law firm with any documents, and never did so."  *Id*. at ¶117.

Plaintiffs allege that the spend-down analysis "indicates that little to no legal work was performed on [Mr. Cotton's] case, or his Medicaid application" and that the analysis lacks any

"client-specific information or recommendations." *Id*. Furthermore, Price requested an additional fee of $6,500 to "develop and assist with [the] implementation of a Long-Term Care Strategy," which Plaintiffs assert was the service SPS had already represented to Ms. Cotton that it was providing  *Id*. After receiving the spend-down analysis, Ms. Cotton decided to terminate the relationship. *Id*. Two days later, Ms. Cotton notified SPS that she had hired an attorney, and was terminating the engagement; she also inquired as to "any refund that is due based on the discontinuation of services." *Id*. at ¶120; *see also* SAC, Ex. HH, May 25 2018 email. On May 29, 2018, Ms. Cotton sent a follow up letter advising SPS that their relationship had concluded and requesting a copy of Mr. Cotton's file. SAC ¶120, Exhibit II, May 29, 2018 Letter.

On July 12, 2018, SPS offered to provide Ms. Cotton with a partial refund of the purportedly non-refundable fee. SAC ¶121; *see also* SAC Ex. JJ, July 20, 2018 Email from SPS. Through her attorney, Ms. Cotton rejected the offer and demanded a full refund. SAC ¶121. Thereafter, SPS advised Ms. Cotton, through her attorney, that the fee was nonrefundable as delineated in the Fee Agreement, but nonetheless offered to resolve the matter by offering to refund half of the fee. *Id.*; *see also* SAC Ex. KK, Letter from SPS's Director of Operations. Ms. Cotton rejected SPS's offer.

Prior to the filing of this lawsuit, Mr. Cotton passed away, and Ms. Cotton, the Executor of his Estate, filed suit on the Estate's behalf.

### 2.    The Wojnas

In late 2017, Helen Wojna, a Connecticut resident, was admitted to Cambridge Manor of Fairfield, LLC  ("Cambridge Health") for rehabilitation services. SAC ¶¶32,123. When it became apparent that Mrs. Wojna's insurance would not pay for additional rehab, Cambridge Health made Mrs. Wojna a resident of their long term care floor and recommended that her sons, Raymond

Wojna, Jr. ("Raymond, Jr.") and David Wojna, contact SPS about obtaining Medicaid qualification for their mother.  *Id*. at ¶124.  At that time, both Raymond, Jr. and David possessed their parents' respective powers of attorney.  *Id*. at ¶30.

In February 2018, David and Raymond, Jr. met with Aaron Hoberman, a SPS representative, at their parents' house in Bridgeport, Connecticut.  *Id*. at ¶125.  At that meeting, Raymond, Jr. executed SPS's Fee Agreement and other paperwork on behalf of his mother, agreed to pay a $6,500 fee, and provided SPS with his mother's financial information.  *Id*., *see also* SAC, Ex. U, Wojna Fee Agreement.  Over the next several months, Raymond, Jr. and Rachel Weiss, the Regional Medicaid Supervisor at SPS, communicated regarding Mrs. Wojna's application.  SAC ¶ 127; *see also* SAC Ex. Y, Email Chain between Rachel Weiss and Raymond, Jr.  Ten months after David and Raymond, Jr. 's initial meeting with Mr. Hoberman, in December 2018, Mrs. Wojna successfully obtained Medicaid eligibility status retroactive to August 2018.  *Id*. ¶129.  On December 31, 2018, SPS sent Raymond, Jr. a letter closing Mrs. Wojna's file.  *See* Compl, Ex. OO.  In that letter, SPS purportedly reminded Raymond, Jr.  "that [Mrs. Wojna's] name needs to be removed from all assets. This included properties, cars, and any kind of resources. This needs to be completed prior to the first redetermination."  *Id*.

Around that same time, Raymond Wojna, Sr. ("Mr. Wojna"), husband to Mrs. Wojna, unfortunately began experiencing health issues of his own, and in December 2018, he was admitted to long-term care at Cambridge Health.  *Id*. at ¶130.  Raymond, Jr. decided to re-enlist SPS's help to obtain Medicare qualification for his father.  *Id*.  Since SPS already had all of the family's financial information and paperwork, SPS allegedly agreed to a reduced fee of $5,000.  *Id*. at ¶131.  However, the Wojnas professedly "did not have access to any liquid funds for [that] amount of money," so "the parties verbally agreed that SPS would start Raymond, Sr.'s paperwork and once

the family was able to liquidate money from their savings bonds or the future sale of Helen and Raymond, Sr.'s house, they would pay them the necessary fee." *Id*. at ¶132.  Plaintiffs allege that, despite the purported oral agreement,  a few days later, SPS "without permission, and by forging Raymond, Jr.'s name, debited Mrs. Wojna's savings account, in the amount of $5,000." [5]  *Id*. at ¶133; *see also* SAC, Exhibit MM, People's United Bank Statement.

A month later, in January 2019, Mr. Wojna, who had not yet qualified for Medicaid, passed away. Then, Raymond, Jr.  and David requested that SPS provide them with a full refund of the withdrawn money.  *Id*. at ¶134.  Although Mr. Hoberman allegedly promised the Wojnas a full refund, SPS account representative Devorah Kanark denied the Wojnas' request.  *Id*. at ¶135. Eventually, Ms. Kanarek offered the Wojnas a full refund of their $5,000 fee if they would be willing to sign a release discharging SPS from liability on any claims that the Wojnas might seek to bring against it.  *Id*. at ¶136.  The Wojnas did not sign the release and, to date, have not received a refund.  *Id*.

Plaintiffs further allege that SPS's involvement complicated the Wojnas' financial situation, because SPS never "alerted the family to change their father's will, nor did it alert[] them to remove Mrs. Wojna's name from all of his accounts and assets."  *Id*. at ¶137.  As a result, upon Mr. Wojna's death, all of his money and assets became Mrs. Wojna's property, and Mrs. Wojna became ineligible for Medicaid.  *Id*.  Accordingly, Mrs. Wojna was required to pay out of pocket, at a rate of $545 per day until her funds were exhausted, and the family had to hire an elder care

---

[5]     SPS disputes Plaintiffs' description of these events and has moved to strike Plaintiffs' allegation that SPS unlawfully debited the savings account.  *See* SPS Br. at 15.  Rather, SPS asserts that "[a]t the meeting on December 6, [2018] Raymond, Jr. electronically signed SPS's Electronic Check Payment Authorization form on Mr. Hoberman's tablet.  The Electronic Check Payment Authorization form was postdated December 20, 2018 to give the Wojnas time to secure enough funds to pay SPS's fee." *Id*.

lawyer to address her financial situation and estate planning needs.  *Id*.  Moreover, in July 2019, Cambridge Health filed a lawsuit against Mrs. Wojna alleging that "because Mrs. Wojna did not transfer her interest in the sale of the property to Mr. Wojna (or to another qualifying financial vehicle), he did not have the funds to privately pay for his care."  *See id*. at ¶138; *see also* SAC Ex. PP, Complaint, Cambridge Manor of Fairfield, LLC v. Helen Wojna, Connecticut Superior Court.  The parties to that action stipulated to placing a judgment lien on the Wojna parents' residence in the amount of $62,540 in order to ensure repayment to Cambridge Health for its services to Mr. Wojna.  *See id*.

### E.    This Putative Class Action

In March 2019, the Estate of Lester Cotton filed the instant lawsuit.  On July 29, 2019, Plaintiffs filed an Amended Complaint, which, *inter alia*, added the Wojnas as plaintiffs.  *See* ECF No. 21.  Thereafter, Defendants filed motions to dismiss.  *See* ECF Nos. 27 and 28. Pursuant to an agreement between the parties, Plaintiffs filed the SAC which asserts various claims under New Jersey law.  *See generally* SAC.   Plaintiffs assert NJCFA and breach of fiduciary duty claims against SPS, only.  *See* SAC Counts I, III.  The remainder of Plaintiffs' claims -- unjust enrichment, breach of the implied covenant of good faith and fair dealing, declaratory judgment and rescission -- are asserted against both SPS and Price.  *See* SAC Counts II, IV-VI.  Notably, although Plaintiffs acknowledge the existence of the Fee Agreement and cite its provisions throughout the SAC, they have not brought a breach of contract claim.  Plaintiffs assert claims on behalf of two groups of putative class members.  *See* SAC ¶147.  Class A, represented by the Cotton Plaintiffs, is defined as "[a]ny citizen of any state who contracted with SPS in either their own individual capacity and/or as Power of Attorney on behalf of another and also contracted with a law firm (Price & Price or otherwise) in either their own individual capacity and/or as Power of Attorney on behalf

of another as part of their contract with SPS" and asserts claims against both SPS and Price.  *Id.*

Class B, represented by the Wojna Plaintiffs, is defined as "[a]ny citizen of any state who

contracted with SPS in either their own individual capacity and/or as Power of Attorney on behalf

of another who did not also contract with a law firm as part of their contract with SPS" and only

asserts claims against SPS.  *Id.*  Subsequently, Defendants filed the instant motions to dismiss all

of Plaintiffs' claims and  strike Plaintiffs' class action allegations.

## II.    LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim

upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss

on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224,

233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in

a complaint "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true

all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's

entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing

that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim

is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555.  The complaint must include

"enough factual matter (taken as true) to suggest the required element.  This does not impose a

probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

## III.   ANALYSIS

### A.   The New Jersey Consumer Fraud Act

Plaintiffs assert NJCFA claims against SPS, alone.  *See* SAC ¶¶154-162.  Specifically, Plaintiffs allege that "SPS engaged in unconscionable affirmative actions, misrepresentations, deceptions, and/or concealments, suppressions, or omissions of material facts attendant to its Medicaid planning services," including:

> A. unconscionably and deceptively claiming they are authorized to provide legal advice and [omitting] . . .  that they are not so authorized to dole out such advice;

B. unconscionably and deceptively claiming they are representing Plaintiffs and the Classes' best interests, when in fact SPS has been operating in the interests of itself, and its actual clients- the corporate long-term care facilities;

C. concealing, suppressing, and/or omitting salient material facts from their communications and contracts with senior citizen and disabled consumers regarding SPS's conflicting interests with the corporate long-term care facilities;

D. and obtaining the contractual consent of Plaintiffs and all members of Classes A and B to the agreements governing their relationship through such fraud, deception, and/or omission, including the facts that they are not lawyers (yet provide legal advice, though faulty or insufficient, despite what their contracts state), or that the clients could possibly not qualify for Medicaid services in the foreseeable future.

*Id*. at ¶160.  Plaintiffs contend that those actions gave rise to a violation of N.J. Stat. Ann. § 56:8-2, which prohibits fraud in connection with the sale of goods, services or real estate, and N.J. Stat. Ann. § 56:8-2.2, which provides that "[t]he advertisement of merchandise as part of a plan or scheme not to sell the item or service so advertised … is an unlawful practice and a violation of the [NJCFA]." *Id*. at ¶156, 161.

SPS argues that the NJCFA does not apply to the Wojnas' claims, as they reside in Connecticut, and further, that Plaintiffs have not adequately alleged any of the elements of an NJCFA claim.  ECF No. 34-1, SPS Br. at 17-28.

The NJCFA is an expansive "legislative broadside against unsavory commercial practices" in the marketplace.  *All the Way Towing, LLC v. Bucks County International, Inc.*, 200 A.3d 398, 400 (N.J. 2019) (citation omitted).  Consistent with the statute's remedial purpose, courts liberally enforce the NJCFA to fulfill its objective to protect consumers from prohibited unconscionable acts by sellers.  *Id*.  The statute provides in relevant part:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others

> rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice ....

N.J. Stat. Ann. § 56:8-2.  "[T]he pleading requirements of Rule 9(b) apply to ... NJCFA claims." *Maniscalco v. Brother Int'l Corp. (USA),* 627 F. Supp. 2d 494, 500 (D.N.J. 2009) (alteration in original) (quoting *Slim CD, Inc. v. Heartland Payment Sys*., No. 06–2256, 2007 WL 2459349, at *11 (D.N.J. Aug. 22, 2007)); *accord  Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Accordingly, in order to state a claim under the NJCFA, a plaintiff must set forth the particular factual circumstances constituting the fraud. *See* Fed. R. Civ. P. 9(b).  That is, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  *Frederico*, 507 F.3d at 200.

To state a prima facie case under the NJCFA, plaintiffs must plead "(1) an unlawful practice; (2) an ascertainable loss; and (3) a causal connection between the two."  *Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 593 (D.N.J. 2016); *see also Dugan v. TGI Fridays, Inc.,* 171 A.3d 620, 636 (N.J. 2017) ("to prevail under the CFA, a plaintiff must not only prove unlawful conduct by defendant, but must also demonstrate an ascertainable loss by plaintiff and a causal relationship between the unlawful conduct and the ascertainable loss." (internal citations and quotation marks omitted)).  Here, SPS challenges all three elements.

### 1.    Choice of Law – The Wojnas and Putative Class B Plaintiffs

As a preliminary matter, the parties agree that the NJCFA clearly applies to the Cotton Plaintiffs because both the Cottons and SPS are citizens of New Jersey.  Pl. SPS Opp. at 34; SPS.

Br. at 19.[6]  However, there is a choice of law issue with respect to the Wojna Plaintiffs and the putative Class B members.[7]  SPS argues that the Wojnas cannot pursue NJCFA claims because they are not New Jersey residents, did not contract with SPS in New Jersey, and the subject matter of the contract has no relation to New Jersey.  SPS Br. at 19.  Furthermore, SPS contends that the choice of law provision in the Fee Agreement does not mandate the application of New Jersey law to this matter, because the clause only applies to disputes related to the interpretation and enforcement of that agreement, itself.  *Id.*  SPS contends that the Wojnas' claims are based on representations "received by them *in Connecticut*, contracts negotiated and entered into in Connecticut for services provided to them *in Connecticut*, and damages allegedly suffered *in Connecticut*."  *Id.* at 5 (emphasis in original).

In response, Plaintiffs contend that because SPS is headquartered in New Jersey and the Company's actions were directed from New Jersey, the NJCFA applies to all of the putative class members, including those who reside in states other than New Jersey, such as the Wojnas.  Pl. SPS Opp. at 34.  Moreover, Plaintiffs assert that the Fee Agreement's choice of law clause "obviat[es]

---

[6]     Class A is defined as "any citizen of any state who contracted with SPS . . . and also contracted with a law firm . . . as part of their contract with SPS" which would seemingly encompass  individuals outside of New Jersey.  SAC ¶147.  However, in their opposition to the instant motions, Plaintiffs assert that "[u]pon information and belief, those individuals from Class A would only reside in New Jersey, post-May 2016, as this is currently the only state in which SPS practices in which it is illegal to conduct those types of activities SPS conducts without a lawyer." ECF No. 37, Pl. Price Opp. at 28-26.  Accordingly, despite the broad class description in the SAC, there does not appear to be a choice of law issue with respect to Class A.  However, Plaintiffs are advised that if the putative Class A members are not all New Jersey residents then there may be looming choice of law questions with regard to those putative class members.

[7]     Moreover, the Wojnas seek to represent a multi-state class consisting of all SPS's clients who reside outside of New Jersey.  The Class B members, represented by the Wojna Plaintiffs, are defined as "[a]ny citizen of any state who contracted with SPS in either their own individual capacity and/or as Power of Attorney on behalf of another who did not also contract with a law firm as part of their contract with SPS."  Because of the choice of law issue, the Wojnas may not be a proper representative for the Class B members.

18

the need to engage in a conflict of laws analysis at all," because their claims clearly involve the interpretation of the agreement. *See* ECF No. 50, Pl. Choice of Law Brief at 1-2. In so arguing, Plaintiffs highlight the Fee Agreement's provision which provides that SPS has the responsibility to determine when "'third-party consulting services,' including specifically the 'advice' of a 'lawyer', are 'necessary'" and reason that "the determination of what constitutes legal service under New Jersey law is something SPS had a contractual duty to determine." *Id*. In Plaintiffs' view, the resolution of Plaintiffs' claims involve the interpretation of the Fee Agreement, which provides for the application of New Jersey contract law, and as such, this Court need not resolve the question of whether SPS's conduct constitutes the unauthorized practice of law in other states in which it operates, or whether any other states' law may govern Plaintiffs' claims. *Id*. at 3.

### a)    The Fee Agreement's Choice of Law Provision

The Fee Agreements signed by both the Wojnas and the Cottons state: "This agreement shall be governed by and construed in accordance with the laws of the State of New Jersey without giving effect to the rules of conflicts of laws." *See* SAC, Ex. B ¶6, Ex. U, ¶6. As a federal court sitting in diversity, when assessing the applicability of the choice of law provision, I must apply the choice-of-law rules of New Jersey to determine the controlling law. *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc*., 313 U.S. 487, 496 (1941); *see also Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008). In New Jersey, "effect [is given] to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *General Motors Corp. v. New A.C. Chevrolet, Inc*., 263 F.3d 296, 331 n.21 (3d Cir. 2001) (citing *Instructional Sys., Inc. v. Computer Curriculum Corp*., 614 A.2d 124, 133 (N.J. 1992)). However, whether a choice of law provision also governs the parties' non-contractual claims, such as tort and fraud claims, turns on the breadth of the provision. *See e.g, Sullivan v. Sovereign Bancorp Inc*., 33 F. App'x 640, 642 (3d Cir. 2002)

(explaining that where an agreement's choice of law provision is "broad and all-encompassing," the provision "encompasses all tort claims that may arise from the [agreement]"). Thus, the relevant question is whether the Fee Agreement's choice of law provision encompasses Plaintiffs' statutory consumer fraud claims; I find that it does not.[8]

The parties dispute the scope of the choice of law provision, and whether it extends to non-contractual causes of action, such as the NJCFA claim.  Plaintiffs argue that under Third Circuit precedent, as set forth in *Crescent International, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943 (3d Cir. 1988), the choice of law provision governs all of the putative class members' claims, including the fraud claim pursuant to the NJCFA.  ECF No. 50, Pl. Resp. Choice of Law Brief. at 3.  Plaintiffs assert that that "whether the claims pled are themselves contractual is not dispositive: what matters is whether 'the claims asserted arise out of the contractual relation and implicate the contract's terms.'"  *Id*. at 2 (quoting *Crescent International*, 857 F.2d at 944).   Plaintiffs contend that "because this Agreement covers the scope of what legal services Defendants promise[d] to provide to Plaintiffs, and Plaintiffs are seeking clarification as to whether these services (or other, omitted services) are legal in nature or not, Plaintiffs' claims necessarily 'arise out of the

---

[8]     The parties largely focus on the choice of law issues presented by Plaintiffs' NJCFA claim, and have not engaged in a choice of law analysis with regard to any other claims.  Notably, although Defendants occasionally, in footnotes, reference the applicable Connecticut law for certain claims, they also apply New Jersey law to all of Plaintiffs' claims.  *See e.g*., SPS Br. at 27 n. 11(arguing that Plaintiffs' unjust enrichment claim fails under both New Jersey and Connecticut law); Price Br. at 27 n.6. ("given that plaintiffs' definition of Class A contemplates a nationwide class, any assessment of their unjust enrichment claim would necessitate an examination of the unjust enrichment laws of each implicated state.")  There are choice of law issues with respect to Plaintiffs' other claims, as well.  The Court need not address these additional choice of law issues, at this juncture.  However, to the extent Plaintiffs intend to file yet another amended complaint, Plaintiffs are advised that they must take into account potential choice of law concerns as to the other asserted claims.

agreement' and should be determined according to the Parties' choice of law clause." *Id*. at 3 (quoting *Crescent International*, 857 F.2d at 944).

In response, SPS argues that *Crescent* is distinguishable from the present case because *Crescent* involved the interpretation of a forum selection clause rather than a choice of law provision.  ECF No. 51, Def. Sur Reply at 4.[9]  SPS contends that "Plaintiffs' claims are focused on SPS's pre-contractual conduct," and thus, do not require interpreting the terms of the Fee Agreement.  *Id*. at 6.  Further, SPS highlights that the contractual language at issue is nearly identical to a choice of law provision analyzed by the Third Circuit in *Black Box Corp. v. Markham*, 127 F. App'x. 22 (3d Cir. 2005), and asserts that consistent with that decision, the choice of law provision should not govern Plaintiffs' tort claims.  *Id*. at 5.

When interpreting the scope of a choice of law provision, courts look to the contractual language.  *See Portillo v. Nat'l Freight, Inc.,* 323 F. Supp. 3d 646, 653 (D.N.J. 2018) (applying New Jerseys' general rules of contract construction in order to interpret the scope of a contractual choice of law provision).  However**,** courts in this District are far from uniform in how they interpret "governed by and construed in" language in choice of law provisions such as the one before this Court.[10]  *See e.g., Carrow v. Fedex Ground Package Sys., Inc.,* No. 16-3026, 2017 WL

---

[9]     Defendants' motion to file a sur-reply to Plaintiffs' choice of law brief is granted, and the Court has considered that brief in ruling on this motion.

[10]     When interpreting the use of the phrase "governed by and construed in accordance with" some courts in this District have found that, under New Jersey law, the phrase is broad enough to govern non-contractual claims, whether tort or statutory, so long as they stem from the contractual relationship.  *See e.g., Pro v. Hertz Equip. Rental Corp*., No. 06–3830, 2008 WL 5218267, at *5 (D.N.J. Dec.11, 2008) ("Choice of law clauses that use the language 'governed and construed by' ... are considered to be broad capturing both contract and tort claims, particularly tort claims that relate to the contract"); *Sullivan v. Sovereign Bancorp, Inc*., No. 99-5990, 2001 WL 34883989 at *8 (D.N.J. Jan. 19, 2001) (holding that choice of law provision which held that "[t]his Agreement shall be governed by and construed in accordance with the domestic internal law (including the law of conflicts of law) of the Commonwealth of Pennsylvania" was "sufficiently broad to

1217119, at *6 (D.N.J. Mar. 30, 2017) (recognizing that "[c]ourts in this district have varied in their approach. Some courts have found the phrase 'governed by and construed under' to be expansive . . . . Other courts have refrained from applying such provisions to tort claims." (internal citations omitted)).  In the most recent, albeit unpublished, Third Circuit case to address this issue, *Black Box Corp. v. Markham*, 127 F. App'x. 22 (3d Cir. 2005), the Court examined a merger agreement between the parties that contained a choice of law provision, which stated that the agreement "will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania."  *Id*. at 23 n.1.  The Court explained that the language utilized was "narrowly drafted to encompass only the underlying merger agreement itself, and not necessarily the entire relationship between [the parties]."  *Id*. at 25.

  As SPS aptly points out, *Crescent*, on which Plaintiff relies, is not controlling.  As an initial matter, the language utilized in the Fee Agreement differs significantly from the contractual language at issue in that case.  *Compare Crescent International*, 857 F.2d at 944 ("any litigation upon any of [the contract's] terms.... shall be maintained in a state or federal court in Miami, Florida." (internal citations and quotation mark omitted)) *with* SAC, Ex. B ¶6, Ex. U, ¶6 ("This

---

encompass contract-related tort claims such as fraudulent inducement.") *aff'd Sullivan v. Sovereign Bancorp., Inc*., 33 F. App'x 640, 642 (3d Cir. 2002.)  However, other courts in this District, interpreting the same language, have concluded that under New Jersey law the phrase should be narrowly construed and thus, does not extend to tort or statutory claims between the parties.  *See Portillo v. Nat'l Freight, Inc*., 323 F. Supp. 3d 646, 652-55 (D.N.J. 2018) (holding that "New Jersey principles of statutory interpretation would counsel a narrow reading of the choice-of-law provision" which provided that "[t]his Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey, without regard to the choice-of-law rules of New Jersey or any other jurisdiction" and therefore the choice-of-law provision did not govern statutory claims, but rather applied "only to interpretation of the Agreement.); *Carrow*, No. 16-3026, 2017 WL 1217119, at *6 (D.N.J. Mar. 30, 2017) (declining to apply choice-of-law provision, which provided that contract was to be "governed by and construed" under Pennsylvania law, to misrepresentation claim because "the most recent Third Circuit decision held that the language in the [contract] does not suffice to encompass tort claims". (internal citations and quotation marks omitted).

Agreement shall be governed and construed in accordance with the laws of the State of New Jersey[.]").  It is abundantly clear that in *Crescent* the Third Circuit was tasked with determining whether a forum selection clause, not a choice-of-law provision, in a contract was sufficiently broad to govern the plaintiff's RICO, fraud, and tortious interference claims.  *Id*. at 944.  The Third Circuit found that the non-contractual claims were governed by the forum selection clause because "pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms."  *Id*. at 944-45.  In that regard, the *Crescent* court's analysis stemmed from the concern that plaintiffs might plead tort claims, in an attempt to circumvent a contract's forum selection clause provision, or force defendants to defend claims in different forums.  *See id*. at 945 ("the narrow interpretation suggested by *Crescent* would permit avoiding a forum selection clause by simply pleading non-contractual claims in cases involving the terms of a contract containing the parties' choice of forum. Adopting it runs counter to the law favoring forum selection clauses .")  These concerns are absent in the context of a choice of law provision.  Accordingly, I do not find *Crescent*'s reasoning persuasive in the context of a choice of law provision, and instead, apply the reasoning in *Markham* and the district court cases that have followed it.  *See Markham*, 127 F. App'x at 25; *Portillo,* 323 F. Supp. 3d at 655 (finding, based on *Markham*, that choice of law provision which provided that agreement "shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey" was "not phrased sufficiently broadly to apply to the non-contractual claims asserted" by the plaintiffs); *Carrow*, No. 16-3026, 2017 WL 1217119, at *6 (finding, based on *Markham*, that choice of law provision which provided that agreement would be "governed by and construed under" Pennsylvania law should be construed narrowly and thus did not govern tort claims).

Moreover, Plaintiffs' attempts to distinguish *Markham* are unavailing.  Plaintiffs contend that the instant matter is distinguishable from *Markham* because there, the parties' claims "were entirely outside of the parties' agreements, such that they could be resolved without reference to the fact or content of the agreements' terms," whereas, here, the claims "are focused specifically on the meaning of the term 'legal advice,'" and "the misleading nature of the parties' agreements themselves."  Pl. Resp. Choice of Law Brief. at 3.  Plaintiffs highlight the language of the Fee Agreement, and maintain that SPS is "illicitly holding itself out as competent to render, and instructs the client to rely upon SPS for, judgment regarding when a legal professional should be retained to provide services in addition to those being provided by SPS." *Id*. at 5.  Contrary to Plaintiffs' arguments, the Fee Agreement's clause affording SPS the discretion to determine whether third-party consultants, including lawyers, are necessary, has little bearing on whether the actual services provided by SPS, or the promised services, constitute the practice of law, nor is it sufficient to transform Plaintiffs' fraud claims into contract-based claims.  Indeed, the opinion that a legal professional may be necessary is not, itself, legal work.  More importantly, as Defendants correctly contend, Plaintiffs' claims largely involve alleged fraud in the inducement and misrepresentations regarding the precise services SPS was contracted to provide.  The nature of their fraud claims has little relevance to the contract language.  Rather, like in *Markham*, the choice of law provision at issue in this case is narrowly drafted and provides that the Agreement shall be "governed by and construed in accordance with" New Jersey law.  Because Plaintiffs' NJCFA claims involve allegations of fraud based on, among other things, the purported representations that SPS could provide legal advice and services which it was not legally authorized to provide,

the contractual choice-of law-provision does not control.[11]   Accordingly, Plaintiffs cannot rely on the choice of law provision in order to allow putative class members who do not reside in New Jersey, such as the Wojnas, to assert non-contractual claims under New Jersey law, including an NJCFA claim.

However, the inapplicability of the Fee Agreement's choice of law provision does not resolve the question of whether the Wojnas, or other out-of-state potential class members, may pursue NJCFA claims.  In order to determine which law governs the Wojna's claims, the Court must engage in a choice of law analysis.  In a prior order, I directed the parties to submit supplemental briefing regarding, *inter alia,* choice of law issues for the putative Class B members. *See* ECF No. 42, June 29, 2020 Letter Order.[12]

### b)   The Most Significant Relationship Test

New Jersey's choice of law rules provide for the application of the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws.  *P.V. ex rel. T.V. v. Camp Jaycee,* 962 A.2d 453, 460 (N.J. 2008).  Under that test, I must first determine whether there is an actual conflict between the relevant laws of New Jersey and those of the other state at issue (here, Connecticut).  *Id*.; *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006).  "That is done by examining the substance of the potentially applicable laws to discern whether 'there is a

---

[11]     Moreover, Plaintiffs' reliance on the Fee Agreements' choice of law provision is plainly at odds with their assertion that the contract is voidable and should be rescinded.  While the validity of the contract is not before the Court on this motion to dismiss, I note the inconsistency in Plaintiffs' position:  Plaintiffs advocate for the broad construction of a choice of law provision contained in an agreement which they are simultaneously seeking to invalidate.  If the contract is voided, Plaintiffs cannot rely on the contract's choice of law provision as a basis for applying New Jersey law to all of their claims.

[12]     Price did not take a position on the choice of law issues related to the Class B claims because those claims are not asserted against it.  *See* ECF No. 46, August 3, 2020 Letter.

distinction' between them." *Id*. at 453 (quoting *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006) (additional citation omitted)).   "If there is not an actual conflict, the inquiry is over." *Lebegern*, 471 F.3d at 428 (citations omitted).  If, however, an actual conflict exists, the inquiry proceeds to the second step, pursuant to which "the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 207 (3d Cir. 2013) (quoting *Camp Jaycee*, 962 A.2d at 453)); *see also Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 180 (3d Cir. 2014).

As an initial matter, the parties dispute whether a conflict exists between New Jersey and Connecticut law.[13]  Plaintiffs posit that there are no substantive differences between the NJCFA or the Connecticut Unfair Trade Practices Act ("CUTPA") and Connecticut's consumer protection laws, nor the states' definitions of the unauthorized practice of law.  ECF No. 47, Pl. Choice of Law Br. at 6.  Further, Plaintiffs contend that "the fact that one state (New Jersey) has formally determined that Defendants' activities are prohibited as the unauthorized practice of law does not in any way foreclose the possibility that, as Plaintiffs claim, the same activities also constitute the unauthorized practice of law in several neighboring states." *Id*.

Although the CUTPA prohibits deceptive acts or practices in the conduct of any trade or commerce, and provides for a private right of action, the New Jersey and Connecticut statutes

---

[13]     Plaintiffs also suggest that "it may be more appropriate for this Court to refuse to entertain this choice of law inquiry at the motion to dismiss stage, where such fact-intensive determinations are essential to the final judgment." Pl. Resp. Choice of Law Brief at 9.  However, Plaintiffs have not identified any additional facts which are  necessary to resolve the choice of law inquiry.  I find that the SAC, which is extensive, provides a sufficient record for this Court to engage in a choice of law analysis, including assessing the Restatement factors attendant to the "most significant relationship" test.  Moreover, in this case, the resolution of the choice of law analysis may impact this Court's subject matter jurisdiction, and therefore, should be resolved at the earliest possible juncture.

differ in several material respects. *See* Conn. Gen. Stat. Ann. § 42-110b(a), 42-1104(a).  For example, both the CUTPA and the NJCFA provide that affirmative misrepresentations and omissions are actionable, however, the level of proof necessary to succeed differs.  In order to state a NJCFA claim based on a fraudulent omission, the plaintiff must demonstrate that the defendant intended to deceive.  *See Sarlo v. Wells Fargo Bank, N.A*., 175 F. Supp. 3d 412, 426 (D.N.J. 2015) (explaining that "an omission or failure to disclose a material fact, if accompanied by knowledge and intent" is actionable under the NJCFA); *Cox v. Sears Roebuck & Co.,* 647 A.2d 454, 462 (N.J. 1994) ("when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud").  However, the CUTPA does not include such a requirement, and courts interpreting the statute have held, that "[d]eception under CUTPA includes a broader range of conduct than common-law claims for fraud or misrepresentation and does not require proof of intent." *Edwards v. N. Am. Power & Gas, LLC,* 120 F. Supp. 3d 132, 141 (D. Conn. 2015); *see also Richards v. Direct Energy Servs., LLC,* 915 F.3d 88, 100 (2d Cir. 2019) ("An act or practice is deceptive under CUTPA if the defendant makes a material representation or omission likely to mislead consumers who interpret the message reasonably under the circumstances" (internal citation quotation marks and citation omitted)).

Furthermore, Plaintiffs fail to address the fact that Class B does not merely consist of Connecticut residents, but would potentially include citizens of any state, other than New Jersey, in which SPS operates.  Indeed, in addition to Connecticut and New Jersey, SPS also allegedly provides services in New York, Pennsylvania, Rhode Island, and Massachusetts.  SAC ¶36.  In that regard, SPS asserts that the consumer protection laws of those states, like Connecticut, also materially differ from the NJCFA in various respects, including with regard to the statutes'

scienter, reliance, and causation requirements, as well as the statutory penalties and applicable limitations periods. *See* ECF No. 45, SPS Supp. Br. at 5-140. For example, there is a clear conflict between the statutory penalties in the NJCFA and New York's deceptive trade practices act; the NJCFA requires the violator to provide "a refund of all moneys acquired by means of any [unlawful] practice," N.J.S.A. § 56:8-2.11, and mandates the payment of treble damages, *see* N.J.S.A. § 56:8-19, while the New York deceptive trade practices law permits one to, "recover actual damages or fifty dollars, whichever is greater," N.Y. Gen. Bus. Law § 349(h), and only permits an award of punitive damages where the court finds that the defendant knowingly or willfully violated the law. *Id*. Moreover, even in such circumstances, the punitive damages award is capped at $1,000. *Id*. Further, both the CUTPA and New York statutes provide for a discretionary award of attorneys' fees, while the NJCFA mandates the payment of attorneys' fees. *Compare* N.J.S.A. § 56:8-19 *with* Conn. Gen. Stat. § 42-110g(d) and N.Y. Gen. Bus. Law § 349(h).

More importantly, here, the crux of Plaintiffs' claims is based on the allegation that SPS's business model consists of the unauthorized practice of law, as outlined in the Committee's May 2016 Opinion, which only applies in New Jersey. The regulation of legal practice differs from state to state and none of the other states in which SPS operates has definitively spoken on this issue; in that respect, Plaintiffs have not proffered any support for their assertion that SPS's alleged conduct would constitute the unauthorized practice of law in those states. Critically, then, there exists a conflict regarding whether the provision of Medicaid spend-down advice constitutes legal advice in Connecticut or any other state in which SPS operates.

As such, I find that there is a material conflict between the NJCFA and the other relevant consumer protection statutes, and turn to the second step of the choice of law analysis. Under the second step of the analysis, this Court must determine which state has the "most significant

relationship" to the claim at issue by weighing the factors set forth in the Restatement section that corresponds to Plaintiffs' causes of action.  *See Nafar v. Hollywood Tanning Sys.*, 339 F. App'x. 216, 220 (3d Cir. 2009).  Here, because Plaintiff asserts claims sounding in fraud, the conflict of laws analysis under Section 148 must be applied. Restatement (Second) of Conflict of Laws § 148 (1971); *see also Agostino v. Quest Diagnostics Inc.,* 256 F.R.D. 437, 462 (D.N.J. 2009); *Nafar*, 339 F. App'x. at 221.

In cases involving fraud, the Second Restatement provides that "when the plaintiff's action in reliance took place in the state where the false representations were made and received, there is a presumption that the law of that state applies."  *Maniscalco*., 709 F.3d at 207 (internal citations and quotation marks omitted) (holding that plaintiff's home state where he received and relied upon alleged fraud, rather than the location of defendants' headquarters had the most signification relationship to plaintiff's consumer fraud claim); *Cooper v. Samsung Elecs. Am., Inc*., 374 F. App'x 250, 255 (3d Cir. 2010) (holding that plaintiff "who purchased the television in his home state of Arizona, is not entitled to sue under the New Jersey consumer fraud statute.  The transaction in question bears no relationship to New Jersey other than the location of Samsung's headquarters. Cooper's claim bears the most significant relationship with Arizona, the state in which the television was marketed, purchased, and used.").  Here, the Wojna Plaintiffs allegedly met with SPS representatives in Connecticut, where they reside, and sought their assistance with Connecticut Medicaid applications.  *See* SAC ¶¶125-26.  Thus, any alleged misrepresentations made by SPS were made and acted upon in Connecticut, and the Wojna Plaintiffs would not have standing to sue under the NJCFA; their NJCFA claims are therefore dismissed.[14]  Without a proper

---

[14]      Section 148(2) of the Second Restatement provides for a different test where the purported misrepresentations were not made and received in the same state.  Under that test, courts analyze "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

representative plaintiff, Class B may not assert NJCFA claims.  Moreover, it is not clear that any of the potential class B members, all of whom, by definition, contracted with SPS outside of New Jersey, would have standing to sue under the NJCFA.  And significantly, if the other out of state putative class members cannot pursue claims under New Jersey law, Plaintiffs would not be able to certify a multi-state class, due to lack of standing.  *Schechter v. Hyundai Motor Am.,* No. 18-13634 2019 WL 3416902, at *3 (D.N.J. July 29, 2019) ("plaintiff may not assert New Jersey state law claims on behalf of the nationwide class, because those out-of-state putative class members did not suffer any injuries in New Jersey"); *McGuire v. BMW of N. Am., LLC,* No. 13-7356, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014) (noting that named plaintiff lacked "standing to assert claims under the laws of the states in which he does not reside, or in which he suffered no injury"

---

(b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." *Grandalski v. Quest Diagnostics Inc.,* 767 F.3d 175, 181 (3d Cir. 2014) (quoting Restatement (Second) of Conflict of Laws § 148(2)).  Here, the misrepresentations were allegedly made by SPS representatives in Connecticut and acted upon by the Wojnas in Connecticut, and thus that test is inapplicable.  But, even assuming that some of the representations were disseminated by SPS representatives located in New Jersey and communicating with the Wojnas via email, under Section 148(2)'s inquiry, Connecticut would still have the most significant relationship to the Wojna Plaintiffs' claims.  The first, second, and sixth factors, that is, the place where the Wojna Plaintiffs acted in reliance upon Defendants' representations, the place where they received the representations, and the place where the Plaintiffs were to render their performance under the contract  would all favor Connecticut.  Only the third factor, the place where defendants made the misrepresentations would weigh in favor of New Jersey, which would be insufficient to warrant the application of New Jersey law.  *See Shapiro v. Logitech, Inc.,* No. 17-00673, 2019 WL 397989, at *9 (D.N.J. Jan. 31, 2019) ("[T]his single contact factor [factor three] cannot be of such significance that it outweighs the contacts in favor of applying" the law of the plaintiff's home state.); *Feldman v. Mercedes-Benz USA, LLC*, No. 11-00984, 2012 WL 6596830, at *7(D.N.J. Dec. 18, 2012) ("In holding that the law of [the plaintiffs'] home state applies, this Court follows a long line of cases in this Circuit holding that a consumer's home state law should apply," regardless of whether the defendant is headquartered elsewhere).

and dismissing plaintiff's nationwide class allegations); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152 (E.D. Pa. 2009) ("[A] plaintiff whose injuries have no causal relation to Pennsylvania, or for whom the laws of Pennsylvania cannot provide redress, has no standing to assert a claim under Pennsylvania law, although it may have standing under the law of another state.").

Furthermore, even if the Wojna Plaintiffs were able to bring a claim under the NJCFA, I find, as explained *infra*, both sets of Plaintiffs have failed to adequately plead a violation of the NJCFA.

### 2.    Unlawful Practices

Under the first element of a NJCFA claim, unlawful practices "fall into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox,* 647 A.2d at 462. When the defendant commits an affirmative act, "intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." *Id.* (citing *Chattin v. Cape May Greene, Inc.*, 591 A.2d 943, 944 (N.J. 1991)). Plaintiffs allege two theories of unlawful acts by SPS. First, Plaintiffs allege that SPS unlawfully performed legal services as non-lawyers and/or falsely advertised services which they could not legally provide. In that regard, Plaintiffs argue that when SPS's conduct is compared to the Committee's description of what constitutes the unauthorized practice of law as outlined in the May 2016 Opinion, "there can be little doubt that SPS's business and commercial practices constituted and continue to constitute 'unlawful practices' as defined by both the federal and state cases which have considered that question." Pl. Op to SPS at 33-34. Second, Plaintiffs allege that SPS violated the NJCFA by agreeing to provide Medicaid application assistance to clients who could not possibly qualify for Medicaid services in the foreseeable future. *Id*. at 35.

In response, SPS argues that that it did not provide legal services, and any legal advice was provided in the spend-down report prepared by Price.  SPS Br. at 22.  SPS emphasizes that federal medical regulations "allow individuals of the applicant or beneficiary's choice to assist in the [Medicaid] application process" and thus, SPS's contracts do not encompass services beyond those permitted by federal law.  SPS Reply Br. at 9-10.  Furthermore, SPS argues – despite Plaintiffs' allegation that SPS signed clients without regard as to whether they would be able to qualify for Medicaid in a timely fashion – that, as alleged in the SAC, SPS successfully obtained Medicaid for Mrs. Wojna and would also have done so for Mr. Wojna, but for his untimely death, and also for Mr. Cotton, but for the premature termination of services by Jennifer Cotton.  *Id*. at 22.

Both of Plaintiffs' theories of unlawful conduct are unavailing.  Turning first to the allegations regarding the legality of the contract, I find that Plaintiffs have not adequately alleged facts demonstrating that SPS promised, and did in fact, provide legal services, in violation of New Jersey or federal law.

Under federal regulations, the Department of Health "must allow individual(s) of the applicant or beneficiary's choice to assist in the application process or during a renewal of eligibility."  42 C.F.R. § 435.908.  Consistent with that regulation, the New Jersey Committee on the Unauthorized Practice of Law has advised that

> [a] Medicaid advisor or Application Assistor may provide information on insurance programs and coverage options; help individuals complete the application or renewal; help them with gathering and providing required documentation; assist in counting income and assets; submit the application to the agency; and assist with communication between the agency and the individual. But the advisor may not provide legal advice on strategies to become eligible for Medicaid benefits, including advice on spending down resources, tax implications, guardianships, sale or transfer of assets, creation of trusts or service contracts, and the like.

May 2016 Opinion at 3.  Thus, it is clear that the preparation and filing of a Medicaid application on behalf of another is permitted under federal law, and cannot constitute an unlawful practice for purposes of the NJCFA.  Rather, the relevant question, at this juncture, is whether Plaintiffs have adequately alleged that SPS falsely promised that it could perform legal work, or whether SPS illicitly tendered legal advice to Plaintiffs.

Whether Plaintiffs have alleged facts demonstrating that SPS performed activities that constitute legal work, is a close question.[15]  The Wojna Plaintiffs allege that during their meeting with SPS, Raymond, Jr. signed the paperwork, gave SPS their family's financial information, and signed a contract with SPS, and ten months later, Mrs. Wojna successfully qualified for Medicaid. SAC ¶¶125, 129.  The Complaint does not identify specific incidents during which SPS provided legal advice, or identify any legal work performed by SPS.  *See generally* SAC ¶¶123-142 (detailing the Wojnas interactions with SPS).  Indeed, an email chain between Raymond, Jr. and the case manager from SPS reveals that their correspondence largely involved SPS's efforts to gather financial information and documents necessary for the Medicaid application, and providing information regarding the status of the application.  However, in their briefing, Plaintiffs

---

[15]     With respect to the Wojnas' claims, Plaintiffs have not identified any case law which supports the proposition that the specific conduct at issue would constitute the unauthorized practice of law in Connecticut.  Rather, Plaintiffs allege that in March 2019, the Connecticut legislature introduced a bill which renders it illegal for individuals not licensed to practice law to provide either "compensated or uncompensated advice about Medicaid planning that involves estate planning tools such as trusts, gifts and asset transfers in order to meet Medicaid income and resource eligibility thresholds."  *See* SAC ¶73.  However, that bill has not yet become law, and cannot inform the Court whether SPS's alleged conduct constitutes the unauthorized practice of law in Connecticut.  Moreover, Plaintiffs have not addressed whether the Wojna Plaintiffs could benefit from a subsequent change in the law that did not control at the time of contracting with SPS.  Absent binding legal authority on this issue, the Court has no basis to conclude that the type of services which SPS provides would violate Connecticut law.  In any event, even if New Jersey law, as outlined in the May 2016 Opinion,  were applicable to the Wojna Plaintiffs' claims, they have not adequately alleged a claim under New Jersey law.

emphasize two specific conversations, detailed in exhibits affixed to the SAC, as evidence of SPS's alleged legal advice.  Pl. SPS Opp. at 27.  On one occasion, prior to being formally hired, Ms. Weiss allegedly provided Raymond, Jr. with an accounting of his parents' assets, and informed him, "[m]ost of the money will need to be liquidated in order to be spent. A Senior Planning case manager can help with this once the case has been retained. If you want to get started on this yourself, here is the information."  *See* SAC Ex. Y, November 12, 2018 email.  On February 11, 2019, Ms. Weiss sent an email to Raymond, Jr. purportedly "recap[ing] [their] conversation" and relayed information regarding his parents' then-open accounts, and stated that Mrs. Wojna's life insurance policy could remain "as is," and to "put in a death claim" on Raymond, Sr,'s policy.  *Id*. February 11, 2019 email.  On their face, neither conversation involved a substantive legal analysis of the Wojnas' assets and their impact on the Medicaid qualification process.  Plaintiffs have not alleged any additional facts regarding the context surrounding those interactions such that this Court can find that it constitutes the unauthorized practice of law under New Jersey's definition.[16] As such, Plaintiffs' factual allegations are insufficient to meet the heighted standard of Rule 9(b). *See* Fed. R. Civ. P. 9(b) (requiring that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Maniscalco,* 627 F. Supp. 2d at 500 (explaining that NJCFA claims are subject to Rule 9b).

The Cotton Plaintiffs' NJCFA claim is similarly deficient.  Although the spend-down report is legal in nature, that document was allegedly prepared by Price, a law firm.  While Plaintiffs allege that the arrangement between Price and SPS was a sham, the only factual allegations that they have proffered in that regard are the minimal fee which Price received and

---

[16]     Even more pertinent here, Plaintiffs have not adequately alleged whether those statements would constitute the unauthorized practice of law under Connecticut law.

the alleged shoddy nature of the work provided.  Although Ms. Cotton was clearly dissatisfied with the nature of the spend-down report, Plaintiffs have not included specific factual allegations sufficient for this Court to infer that SPS, rather than Price, drafted the spend-down report.  Indeed, a specific factual basis for Plaintiffs' assertion that SPS, rather than Price, performed the legal work related to Mr. Cotton's spend-down analysis is necessary in order to satisfy Rule 9(b)'s exacting standards.  *See Fuqua v. Bristol-Myers Squibb Co.,* 926 F. Supp. 2d 538, 550 (D.N.J. Feb. 15, 2013) (noting  that Rule 9(b) precludes a litigant from alleging "conclusory, generalized facts"); *In re Catanella & E.F. Hutton & Co., Sec. Litigation*, 583 F. Supp. 1388, 1397 (E.D. Pa. 1984) (stating that "Rule 9(b)'s particularity requirements prohibit reliance upon unsubstantiated conclusory allegations.").  Furthermore, to the extent Plaintiffs contend that the spend-down report included "little to no legal work," Plaintiffs' claim sounds in breach of contract, rather than fraud.

Nevertheless, Plaintiffs additionally allege that after drafting the spend-down report, Price allegedly requested an additional fee of $6,500 to "develop and assist with implementation of a Long-Term Care Strategy."  SAC ¶117.  Plaintiffs aver  that the service Price offered was "exactly the services SPS had represented to Ms. Cotton that she was purchasing in the first place from SPS."  *Id.*  Critically, however, Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake," and here, Plaintiffs have not alleged any specific facts regarding the misrepresentations which induced Ms. Cotton to contract with SPS and Price. For example, Plaintiffs' theory of the case could be supported by allegations that the SPS agents falsely represented that SPS could provide the legal services relevant to effectuating a spend-down of Plaintiffs' assets, such as providing advice regarding the creation of trusts or guardianships, or retitling assets.  Under New Jersey law, that would be an actionable misrepresentation, as non-lawyers cannot proffer Medicaid spend-down advice.  However, as presently pled, Plaintiffs'

Complaint is devoid of specific facts suggesting that SPS either performed legal work on behalf of any of the Plaintiffs, or promised that it would provide legal services.

Importantly, both Plaintiffs' Fee Agreements provide that SPS was being retained "to guide, assist, oversee, file the application, and perform related follow-up activities associated ted with the Medicaid application process," and that the "Applicant acknowledges and agrees that [SPS] does not provide any legal service or advice and Applicant is not relying on [SPS] to furnish any legal services or advice. " *See* SAC Exs. B, U.  With regard to the Cotton Plaintiffs, the Fee Agreement further provides that the applicant understands that "[SPS's] portion of the fee is strictly for [SPS's] assistance in preparing and filing a complete Medicaid application. SAC Ex. B.  Thus, the Fee Agreement expressly belies the allegation that Plaintiff and SPS specifically contracted for SPS to provide legal services, and Plaintiffs have not alleged facts demonstrating that SPS conducted legal work on their behalf.  Absent specific factual allegations demonstrating that SPS did, in fact, perform actions which could be construed as legal work, the Court cannot find that Plaintiffs have adequately alleged an unlawful practice sufficient to support their NJCFA claim.  Moreover, Plaintiffs have not alleged that the SPS representatives made any specific representations that SPS was qualified to perform legal work, or alternatively, that SPS assured them that the services attendant to the spend-down process, such as re-titling assets, creating trusts and guardianships, or providing advice regarding the tax implications of certain transactions -- all of which are typically legal in nature -- could be provided by SPS, or non-lawyers.  Critically, the Complaint is devoid of any specific statements, promises or representations made to Plaintiffs during their meetings with SPS representatives.[17]  *See Giercyk v. Nat'l Union Fire Ins. Co. of*

---

[17]     Plaintiffs' SAC identifies an email exchange between a Rhode Island attorney, posing as a potential client,  and an SPS "Intake Support" employee. During the exchange, the attorney allegedly inquired whether SPS can "advise [her] with the spend down process or do I need a RI

*Pittsburgh*, No. 13-6272, 2015 WL 7871165, at *5 (D.N.J. Dec. 4, 2015) (dismissing plaintiffs'

NJCFA claim based on false advertising with respect to insurance policy coverage because

"Plaintiffs do not allege, in particular, which policy provisions were inconsistent with the

advertising statements; which Defendants (identified individually, not collectively) made the

statements; when the statements were made; who relied on these statements; when Plaintiffs relied

on them; or any other substantiating information"); *see also Lum v. Bank of Am.,* 361 F.3d 217,

224 (3d Cir. 2004) (explaining that to satisfy Rule 9(b) "Plaintiffs also must allege who made a

misrepresentation to whom and the general content of the misrepresentation").  Such allegations

are critical to Plaintiffs' claims, particularly since the express language of the contract clearly

contradicts Plaintiffs' assertions that SPS promised to get them "on Medicaid" and perform any

legal services necessary to do so.

　　　　Further, although the SAC alleges that SPS held itself out as being qualified to provide

legal services and highlights excerpts from the Company's website, Facebook page, and other

promotional materials, and the website's averments would suggest that SPS did, in fact, provide

such legal services, the SAC does not allege that Plaintiffs were beguiled by those claims.  Neither

the Cottons nor the Wojnas alleged that they saw those advertisements or ever visited the

Company's website or Facebook page prior to retaining SPS.  In fact, both the Wojnas and the

Cottons were allegedly referred to SPS by their respective nursing homes.  However, there may be

---

attorney for that in addition to your company?" The SPS employee allegedly responded, "[w]e can
definitely advise and guide on the spend down process."  SAC ¶79; *see also* SAC Ex. X, March
15, 2018 email exchange.  However, Plaintiffs have not proffered any information with regard to
the status of Rhode Island law on Medicaid assistors, nor is the Rhode Island attorney one of the
named plaintiffs; thus that exchange is insufficient to demonstrate that Plaintiffs, like that
individual, were the recipients of a specific misrepresentation regarding the scope of the services
to be provided.

other potential class representatives who were subjected to the alleged misrepresentations on the website and could conceivably assert an NJCFA claim on that basis.

Plaintiffs' second theory involves the allegation that SPS signed clients without regard to whether they could qualify for Medicaid, in a timely fashion.  As pled, Plaintiffs' claims are unavailing.  As an initial matter, Mrs. Wojna, the only named plaintiff to complete the entire Medicaid application process with SPS, did, in fact, qualify for Medicaid.  Notably, both Mr. Wojna and Mr. Cotton did not complete the Medicaid application process; Mr. Wojna's process was halted due to his untimely death one month after contracting with SPS, while Ms. Cotton unilaterally terminated the agreement with SPS after receiving the spend-down analysis, but before submitting a Medicaid application.  Moreover, although the Cotton Plaintiffs allege that the representative "from SPS never once mentioned that her father might not qualify for Medicaid," the Fee Agreement clearly provides that SPS does not guarantee the success of the Medicaid application.  *Compare* SAC ¶111 with SAC Ex. B, Cotton Fee Agreement ("[SPS] does not guarantee that fulfilling my obligations will secure Medicaid eligibility of the Applicant").  Absent an allegation that SPS expressly promised Plaintiffs that the Medicaid application would be approved, and that SPS did not have a basis to so conclude, or knew that the Plaintiffs would not qualify, Plaintiffs have not adequately alleged fraud in this context.[18]

### 3.    Ascertainable Loss

---

[18]    Although I find that Plaintiffs have not adequately alleged an NJCFA claim at this juncture, this does not foreclose the possibility that Plaintiffs could conceivably allege such a claim. Plaintiffs' allegations regarding SPS's purported business model raise red flags.  However, based on the circumstances as alleged by the Cotton Plaintiffs, the only class representatives in this action able to assert claims based on New Jersey law,  they do not constitute fraud.  In light of the Cottons' unique posture, namely that they did not pursue the Medicaid application process with SPS, they may not be the appropriate class representatives for this action.

Plaintiffs argue that they have sufficiently alleged ascertainable loss by demonstrating that SPS sold legal services which it lacked the right to sell, and thus, the amounts paid to SPS by Plaintiffs, a total of $18,000 ($6,500 by the Cottons and $11,500 by the Wojnas) constitute ascertainable loss. Pl. SPS Opp. at 23.

SPS challenges Plaintiffs' ascertainable loss allegations on several bases. First, it contends that "the SAC alleges no plausible basis for any injury to Ms. Cotton, David, or Raymond, Jr. These individuals did not interact with any Defendant in their individual capacities, had no contract with SPS (or any Defendant), and paid nothing to SPS (or any Defendant)." SPS Br. at 23. Furthermore, SPS argues that because SPS's contracts with Ms. Cotton and Raymond, Jr. were terminated, the Plaintiffs compounded the harms to the estates, and those harms should not be considered in analyzing ascertainable loss. *Id*. at 23-24. Thus, in SPS's view, Mr. Cotton and Mr. Wojna's NJCFA claims fail because they make no attempt to account for the value received or otherwise explain how their loss can be calculated in light of the unknowable "but for world" created, in part, by Ms. Cotton and Raymond, Jr.'s own actions *Id*. at 24. Finally, SPS contends that Plaintiffs cannot allege ascertainable loss based solely on the fees paid to SPS, because those fees were paid pursuant to the Fee Agreement, and Plaintiffs have not alleged facts demonstrating that "any of the services provided to them (whether arguably 'legal' or not) were inferior, inaccurate, or deficient in any respect." *Id*. at 25. SPS further contends that "Plaintiffs paid for Medicaid application assistance services, which the federal Medicaid regulations expressly permit SPS to sell" and that is precisely what they received. SPS Reply Br. at 11.

To establish "ascertainable loss," under the second element of a CFA claim, a plaintiff must show "evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss." *Thiedemann v. Mercedes–Benz USA, LLC*, 872 A.2d 783, 790 (N.J. 2005). "[A] claim of

loss in value must be supported by sufficient evidence to get to the factfinder. To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory." *Id.*; *see also Weinberg v. Sprint Corp.*, 801 A.2d 281, 290 (N.J. 2002). An "ascertainable loss" equates to "a definite, certain and measurable loss, rather than one that is merely theoretical." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). Ascertainable loss takes the place of "the traditional reliance element of fraud and misrepresentation," because the NJCFA "does not require proof that a consumer has actually relied on a prohibited act in order to recover." *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co*., 929 A.2d 1076, 1076 (N.J. 2007).

"There are at least three recognized theories of ascertainable loss that may apply to a NJCFA claim." *Chernus v. Logitech, Inc.*, No. 17-673, 2018 WL 1981481, at *13 (D.N.J. Apr. 27, 2018) (quoting *Hammer v. Vital Pharms., Inc*., No. 11-4124, 2012 WL 1018842, at *8 (D.N.J. Mar. 26, 2012)). First, an "out-of-pocket" theory may include the purchase price of a misrepresented product or service if the purchasers did not receive a refund and the seller's misrepresentations rendered the product or service essentially worthless. *Id*. Second, a "loss-in-value" theory is based on the quantifiable difference in value between the merchandise or service as [advertised] and the product or service received. *Id*. Under the third theory, an ascertainable loss can include a nominal overcharge for which the plaintiffs have not made a pre-suit demand for a refund. *Id*.

Plaintiffs allege that SPS fraudulently induced them into entering the Fee Agreement at issue, and that absent SPS's misrepresentations about the services provided, they would not have contracted with the Company. As such, Plaintiffs seek the fees they paid to SPS under the Fee Agreement, and statutory damages. Assuming Plaintiffs are able to demonstrate that SPS in fact

misrepresented the services being provided, or that SPS provided unauthorized legal advice, SPS would not be entitled to the fees under the contract.  In that regard, Plaintiffs have sufficiently pled the existence of an actual, definite, ascertainable loss, in the form of the fees paid to SPS.[19]  *U.S. ex rel. Krahling v. Merck & Co*., 44 F. Supp. 3d 581, 608 (E.D. Pa. 2014) (finding that plaintiffs adequately alleged an ascertainable loss for NJCFA claim where plaintiffs sought "compensatory damages for the vaccine, and thus claim to have suffered a loss in the amount of the purchase price."); *see also Union Ink Co., Inc. v. AT & T Corp*., 801 A.2d 361, 380 (N.J. App. Div. 2002) (an ascertainable loss occurs "when a consumer receives less than what was promised."). Nonetheless, as discussed above, Plaintiffs' NJCFA claim is dismissed for failure to adequately plead an unlawful practice by SPS.

### B.      Subject Matter Jurisdiction

The infirmity of Plaintiffs' NJCFA claims creates a question regarding the existence of this Court's subject matter jurisdiction.  This Court has jurisdiction over this matter pursuant to the CAFA, 28 U.S.C. § 1332(d), which provides for original jurisdiction over class actions where (1) the matter in controversy exceeds $5 million, exclusive of interest and costs, (2) any member of the class of plaintiffs is a citizen of a state different from any defendant, and (3) the class has at least 100 members.  28 U.S.C. §§ 1332(d)(2)(A), (d)(5)(B), (d)(6).   CAFA's $5 million amount in controversy requirement could be problematic for Plaintiffs for two reasons.  First, as explained, *supra*, the Wojnas and the other out-of-state putative class members cannot pursue claims under New Jersey law, which prevents Plaintiffs from pursuing a multi-state class based upon, *inter alia*, the NJCFA.  *See Schechter v. Hyundai Motor Am*., No. 18-13634 , 2019 WL 3416902, at *3

---

[19]      SPS purportedly offered the Wojna Plaintiffs a full refund, and offered the Cotton Plaintiffs a 50% refund, neither of which were accepted.  *See* SAC  ¶¶121, 136.  Accordingly, the refund offer does not negate Plaintiffs' ascertainable loss.

(D.N.J. July 29, 2019) ("plaintiff may not assert New Jersey state law claims on behalf of the nationwide class, because those out-of-state putative class members did not suffer any injuries in New Jersey").  Second, it is not clear that Class A, alone, will satisfy the amount in controversy. In a prior order, the Court directed the parties to address whether Class A independently meets the requirements for CAFA  jurisdiction, including how many members comprise the class and the amount of their potential claims.  *See* June 29, 2020 Letter Order.  In response to the Court's inquiry, Plaintiffs explained that after accounting for treble damages and attorneys' fees, both of which may be awarded under the NJCFA, Class A's NJCFA claims amount to approximately $5.1 million, satisfying CAFA's jurisdictional minimum.  Pl. Choice of Law Br., at 3.  Relying on a declaration from SPS's CEO Ben Mandelbaum, Plaintiffs assert that between January 1, 2016 and March 25, 2019 (the date on which Plaintiffs filed the instant complaint) SPS and Price jointly contracted with at least 340 clients and that the fee charged to those clients averaged at or above $5,000 per client, resulting in potential damages of $1.7 million, before trebling or attorney's fees. *Id*.; *See also* ECF 47, Ex A Declaration of Ben Mandelbaum ("Mandelbaum Decl.").[20]  Only once trebled does the amount in controversy exceed CAFA's $5 million requirement.  *See* Pl. Choice of Law Br., at 3.  Thus, based on Plaintiffs' own calculations, the existence of CAFA jurisdiction is premised on Plaintiffs' NJCFA claim and the treble damages and attorney's fees provided under the statute.  However, as currently pled, Plaintiffs have not adequately alleged a NJCFA claim.  If Plaintiffs are unable to adequately allege an NJCFA claim, it does not appear that they would be able to satisfy CAFA's $5 million amount-in-controversy requirement, and subject matter

---

[20]      The Declaration further states that "[a]s of March 25, 2019, at least one member of the Putative Class A was a citizen of a state other than New Jersey," which is sufficient to establish the minimal diversity required  under CAFA.  Mandelbaum Decl. ¶4.

jurisdiction would be lacking.[21]  Accordingly, I will not address, in detail, Defendants' motions to dismiss Plaintiffs' unjust enrichment, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing claims, and Defendants' motions with respect to those claims is denied without prejudice.  If Plaintiffs file an amended complaint more particularly alleging the NJCFA claim for the Class A plaintiffs, Defendants may file a renewed motion to dismiss these additional claims.

Nonetheless, because I am granting Plaintiffs leave to file an amended complaint, I briefly note the potential hurdles facing some of Plaintiffs' other claims in order to guide them in drafting a new complaint.  With respect to Plaintiffs' fiduciary duty claim against SPS, Plaintiffs' Complaint seemingly asserts a fiduciary relationship based on the language of Plaintiffs' agreements with SPS.  *See* SAC ¶¶167-172.  However, "[u]nder New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  *Perkins v. Wash. Mut., FSB*, 655 F. Supp. 2d 463, 471 (D.N.J. 2009) (quoting *Saltiel v. GSI Consultants, Inc*., 788 A.2d 268, 275 (N.J. 2002)).  Accordingly, Plaintiffs cannot assert that their contractual relationship with SPS, alone, gave rise to a fiduciary relationship.  Rather, in order to assert a fiduciary duty claim, Plaintiffs must allege facts demonstrating that their relationship with SPS was akin to a "traditional fiduciary relationship[ ]. . .  between trustee and beneficiary, guardian and ward, agent and principal, attorney and client, corporate director and

---

[21]    It does not appear that Plaintiffs' other claims, such as unjust enrichment, breach of fiduciary duty and rescission, alone, would surpass CAFA's $5 million threshold.  On these claims, the bulk of Plaintiffs' damages would likely stem from the fees remitted to SPS by the putative class A members, which Plaintiffs assert constitutes approximately $1.7 million.  Nor does it seem likely that Class A's claims against Price would significantly increase the amount in controversy.  Assuming each of the approximately 340 putative Class A members paid Price a fee of $325, like the Cotton Plaintiffs,  the amount in controversy would still fall short of $5 million.

shareholder, and the members of a partnership." *Read v. Profeta,* 397 F. Supp. 3d 597, 633 (D.N.J. 2019). Or that Plaintiffs "place[d] trust and confidence in another who is in a dominant or superior position," or "under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonnell*, 696 A.2d 697, 704 (N.J. 1997).

Plaintiffs also assert a breach of the implied covenant of good faith and fair dealing claim against both Defendants. Such a claim is plainly at odds with Plaintiffs' position that the Fee Agreements are unenforceable and should be voided or rescinded, because that claim presumes enforceable contracts between the parties. Presumably, however, Plaintiffs plead such a claim as an alternate theory, in the event that their claim that the Fee Agreements are void proves unavailing. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Nonetheless, with respect to the claim against SPS, Plaintiffs' allegations in this regard are at odds with the contracts' stated terms.[22] Plaintiffs contend that SPS promised to get them "on Medicaid" without regard to whether Plaintiffs could actually effectuate a timely spend-down, but the Fee Agreement clearly provides that "[SPS] does not guarantee that fulfilling [the contractual] obligations will secure Medicaid eligibility of the Applicant" and that "[i]t is expressly agreed and understood by [the applicant] that no promises, assurances, or guarantees are being made by [SPS] as to the eligibility of the Medicaid Applicant and/or the acceptance made of the Medicaid application and Medicaid benefits." *See* SAC Ex. B, ¶¶3, 6. Plaintiffs cannot conceivably argue that they were denied their justifiable expectations

---

[22]   With respect to Price, Plaintiffs allege that the law firm  "breached its obligation of good faith and fair dealing because it (i) never appeared at any client meeting to introduce or explain its fee agreement or services; (ii) never engaged in any actual or meaningful analysis of the Cotton Plaintiffs' or the Members of Class A's assets to assist with long-term planning; and (iii) followed up its analysis with a proposition to engage Price & Price for the implementation of another long-term strategy for an additional fee of $6,000." SAC ¶ 179. This claim, unlike the claim against SPS is not expressly contradicted by the terms of the parties' contract.

under the contract where the contract expressly provides that SPS cannot guarantee that the applicants will qualify for Medicaid.  Plaintiffs cannot utilize the implied covenant of faith and fair dealing to supplement the contract with additional terms which contradict the parties' clearly laid out contractual expectations.  *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001) ("the implied covenant of good faith and fair dealing cannot override an express term in a contract"); *accord Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 586 (N.J. 1997).  When drafting their amended complaint, Plaintiffs should be mindful of these potential issues, as well as the potential choice of law issues facing Plaintiffs' other non-contractual claims.

### C.    Motions to Strike

Pursuant to Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The Rule 12(f) "standard essentially translate[s] into application of the standards of a Rule 12(b)(6) motion to dismiss, with the understanding that a motion to strike should be granted sparingly."  *Eisai Co., Ltd. v. Teva Pharm. USA, Inc.,* 629 F. Supp. 2d 416, 424 (D.N.J. 2009).  Although the Court has "broad discretion in resolving motions to strike," *see Turner v. New Jersey State Police*, No. 08-5163, 2014 WL 6991892, at *2 (D.N.J. Dec. 5, 2014), motions to strike under Rule 12(f) are disfavored and should generally be denied " 'unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or ... confuse the issues.'"  *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (quoting *Tonka Corp v. Rose Art Indus., Inc*., 836 F. Supp. 200, 217 (D.N.J. 1993)); *see also Eisai Co.,* 629 F. Supp. 2d at 425 (explaining that striking a pleading is a "drastic remedy to be resorted to only when required for the purposes of justice") (internal quotation marks and citation omitted).

### 1.    The Allegedly Immaterial Allegations

SPS moves to strike the allegation 1) that SPS forged Raymond, Jr. 's signature and debited the $5, 000 fee from the Wojna family's account without permission, and 2) that SPS never alerted the Wojna family to change the father's will or remove Mrs. Wojna's name from his accounts and assets.  SPS Br. at 48-50;  *see also* SAC 133, 137.  SPS contends that these allegations are both false, as well as "immaterial, scandalous, and prejudicial allegations designed solely to tarnish SPS's reputation."  SPS Br. at 48.  As to the fee, SPS asserts that "Raymond, Jr. signed SPS's Electronic Check Payment Authorization form on Mr. Hoberman's electronic tablet when Raymond, Jr. met with Mr. Hoberman at the Wojna residence on December 6, 2018 to sign SPS's Fee Agreement and other forms on behalf of Mr. Wojna," as indicated on an exhibit Defendants attatched to their motion, and that "Directly after Raymond, Jr. did so, Mr. Hoberman sent an email to three SPS employees attaching the form, stating: "Postdated for 12/20/2018 Not yet cdi [cash deliverable immediately] Rachel [Weiss] to advise when cashable[.]"  *Id*.  SPS also contests the allegation that they did not advise the Wojnas regarding Mr. Wojnas' assets, arguing "[a]s shown in Plaintiffs' Exhibit OO, on December 31, 2018, Ms. Weiss of SPS sent Raymond, Jr. a letter that clearly states: "Please remember that Helen's name needs to be removed from all assets. This includes properties, cars, and any kind of resources. This needs to be completed prior to the first redetermination."  SPS Br. at 50.; *see also* SAC Ex. OO.  Furthermore, SPS asserts that neither allegation plays a role in Plaintiffs' underlying claims, rendering them immaterial.

Plaintiffs argue that "[a]n inspection of the signature reveals that it is almost too perfect to have occurred on a tablet" and that "the Wojnas themselves disputed this payment with their bank."  *See* Pl. Opp to SPS at 47.  Furthermore, Plaintiffs assert  "SPS's reliance on a sentence contained in one letter, attached to one email, to prove that they alerted the [Wojna]  family to change the

title of the house to their father to avoid any Medicaid penalties, is incredulous at best. There is not a single email from Ms. Weiss in any of her many communications to the Wojna families that reiterates or clarifies this extremely important point for them. This important information has relevance to Plaintiffs' claims of misrepresentation and unauthorized practice of law (*i.e.* the fact that it was sent (as SPS admits) proves that SPS committed the Unauthorized Practice of Law in New Jersey and Connecticut." *Id*. at 48.

SPS has not demonstrated that either of the factual allegations subject to the motion to strike are clearly false; it is also clear that these factual allegations are not inherently scandalous or wholly irrelevant to Plaintiffs' claims.  The Court is cognizant of SPS's position that it was authorized to withdraw the funds at issue; however, at this early phase of the case, it is not this Court's role to assess the truth or falsity of that claim.  Similarly, the assertion that SPS never alerted the Wojna family to change the father's will or remove Mrs. Wojna's name from his accounts and assets relates to Plaintiffs' claims that SPS misled them about the scope and nature of the services SPS intended to provide.  Accordingly, SPS's motion to strike these allegations is denied.

### 2.    Class Action Allegations

Defendants also move to strike the class allegations from Plaintiffs' Complaint, pursuant to Federal Rule of Civil Procedure 12(f).  *See* SPS Br. at 38-46; Price Br. at 16-36.  At this juncture, it is unclear whether the Court will be able to maintain subject matter jurisdiction over this action and Plaintiffs have been granted leave to file an amended complaint.  Accordingly, the motion to strike the class allegations is dismissed without prejudice as premature.  *McBrearty v. Fifth Generation, Inc.,* No. 14-7667, 2015 WL 4749040, at *4 (D.N.J. Aug. 6, 2015) (denying motion to strike class allegations as moot where plaintiffs' claims were dismissed, but plaintiff was granted

leave to amend the complaint); *Hughes,* No. 10–846, 2011 WL 2976839, at \*28 (same).  The Court will ascertain whether a motion to strike class action allegations is appropriate if Plaintiffs file an amended complaint.

### D.      CONCLUSION

For the reasons set forth above, SPS's motion to dismiss is **GRANTED IN PART AND DENIED IN PART** and Price's Motion is **DENIED**. SPS's motion to dismiss is **GRANTED** with respect to Plaintiffs' NJCFA claim, and that claim is dismissed without prejudice and may be re-pled as to the Cotton Plaintiffs and putative Class A members;  Plaintiffs are granted leave to file an amended complaint consistent with this Opinion within 45 days.  The Court denies SPS's motion to dismiss to Plaintiffs' breach of fiduciary duty claim and both Defendants' motions to dismiss the breach of the implied covenant of good faith and fair dealing, unjust enrichment, declaratory judgment, injunctive relief and rescission claims, without reaching the merits.  If Plaintiffs file an amended complaint, Defendants may file renewed motions to dismiss those claims.  Defendants' motions to strike Plaintiffs' class action allegations and strike certain factual allegations from the SAC are also denied.

Date: November 30, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge

48